**AGWAY, INC.**

v.

**John ERNST and John Ernst, Inc.**

Supreme Judicial Court of Maine.

Nov. 21, 1978.

Pierce, Atwood, Scribner, Allen, Smith, & Lancaster by Malcolm L. Lyons (orally), David T. Flanagan, Portland, for plaintiff.

Jolovitz & Niehoff by Lawrence Boris (orally), William P. Niehoff, Waterville, for defendant.

Before POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

POMEROY, Justice.

Appellant Agway, Inc. filed suit in 1972 in the Superior Court, Kennebec County against appellee Ernst for $19,691.16[1] alleged to be due on an account. Ernst counterclaimed for $47,224.00, alleging that over a four-year period Agway had overcharged him in that amount. The parties subsequently agreed to submit the case to a referee, reserving rights of appeal. M.R. Civ.P. Rule 53.

After hearings, the referee found that an oral agreement had existed between Agway and Ernst, and that Agway's billings were in violation of the terms of such oral agreement. He concluded there was a resulting overcharge of $48,694.40. However, because part of that agreement had been appropriately terminated, the amount due on the counterclaim was offset by the $19,184.89 which Ernst owed Agway. Over the objection of Agway, the referee's report was accepted in the Superior Court. A motion for a new trial by Agway was denied. This appeal followed.

1. The parties later stipulated that the correct amount was $19,184.89.

We deny the appeal.

Prior to 1967, Ernst, an egg producer, bought the bulk of his feed from a supplier named Wirthmore. The feed consisted of a standard mash and a special mixture called "*Ernst special scratch No. 9.*" Ernst testified that his pricing agreement with Wirthmore encompassed three relevant points: (1) that he would receive a 2% discount on the price of the feed if he paid within ten days of delivery; (2) that the "*scratch No. 9*" would be priced at the cost to Wirthmore of the ingredients plus $3.00 per ton for milling costs and $2.50 per ton for trucking, and (3) that Wirthmore would furnish Ernst with copies of its wholesale price lists on a regular basis. The referee accepted Ernst's testimony.

In 1967, Wirthmore was purchased by Agway,[2] and the Wirthmore personnel with whom Ernst had dealt went to work for Agway. Ernst testified that an area manager for Wirthmore who had joined Agway had stated that if Ernst would keep his business with Agway, Ernst could have the same pricing agreement that he had originally had with Wirthmore. While the manager denied making this statement, the referee apparently believed Ernst, and found that Agway and Ernst had entered into this "*agreement.*"

In 1969, Agway's Board of Directors voted to discontinue its 2% discount policy. Notices of this discontinuation were mailed to all Agway customers shortly thereafter, and the practice of noting the discount on the face of their invoices was discontinued. While Ernst said he did not realize that the discount policy had been terminated until 1971, the referee found that Ernst had constructive notice of the discontinuation, and concluded that Agway was entitled to the $19,184.89 which Ernst had withheld under the assumption that he was entitled to a discount.[3] No part of that conclusion is at issue in this appeal.

As to other aspects of the "*agreement*", the referee found that Agway had changed its "*scratch No. 9*" pricing policy without notifying Ernst, that Agway had failed to supply wholesale price lists, and that Agway had overcharged Ernst in the amount of $48,694.40. While Ernst had not objected to the overcharge until 1971, some four years after the pricing formula had been changed, the failure to object stemmed from Agway's failure to supply the price lists. The referee therefore, recommended judgment be entered for Ernst on his counterclaim. The Superior Court accepted this recommendation. It is from this portion of the judgment that Agway appeals.

The principal contention raised by appellant relates to the enforceability of the oral agreement; it is to that dispute that we now turn.

Appellee concedes that the oral agreement reached between Ernst and appellant's agent, specifically found by the referee to have been made, did not constitute a binding contract. Such a concession is appropriate, inasmuch as the agreement clearly lacked consideration. The purchases to be made by Ernst were conditioned entirely on his whim; he was under no obligation to satisfy all, or even any, of his needs from appellant. Conversely, appellant Agway could at any time decline to supply Ernst as had been "*agreed.*" The authorities are unanimous that such an arrangement is not in itself a binding contract enforceable by either party. *Restatement of Contracts*, § 80; Simpson, *Law of Contracts*, § 56 (1965).

It is equally certain, however that promises originally incapable of enforcement may by performance become binding. 1 *Williston on Contracts*, § 106, p. 427 (3d Ed. 1967). *See* Note, 10 *Ford L.Rev.* 294. This is because, as Williston points out, "*only promises need consideration. Transfers, and other actual performances may be made without consideration.*" *Williston, supra* at 428.

---

**2.** See 11 M.R.S.A. § 2–210(4) by the terms of which Agway became bound to perform Wirthmore's promises.

**3.** 11 M.R.S.A. § 2–209(1) provides that no consideration is needed to make an agreement modifying a contract binding.

In his findings of fact, the referee carefully refrained from concluding that a *"contract"* had been made, repeatedly referring, rather, to the making of an *"agreement."* The existence of an agreement, involving as it does so intricately the conduct of the parties, is appropriately a question for the trier of fact. *Willard v. Randall*, 65 Me. 81 (1876). The question disputed on appeal is whether such an agreement, in the circumstances,[4] imposes any legal obligation. The referee concluded that it did, but insofar as that implicates questions of law we must make an independent determination of the issue.

*Gill v. Richmond Co-op Association*, 309 Mass. 73, 34 N.E.2d 509 (1941), involving strikingly similar facts, merits discussion. Defendant's agent orally agreed with plaintiff milk distributors to supply them for one year with such milk as they might order, at a price computed accordingly to a set formula similar to that involved in the instant case.[5] All milk shipped to plaintiffs was billed in good faith and paid for, unknown to plaintiffs, at defendant's usual prices. These prices were higher than those proposed by defendant's agent.

The court noted first that no contract had been formed by the *"agreement,"* since neither party was bound to perform. It concluded, however, that the *"agreement"* controlled the parties' rights:

> [*t*]*he whole effect of the agreement or arrangement made with [defendant's agent] was to furnish while it continued a price basis upon which it might be inferred that the parties contracted in making subsequent sales and purchases of milk.* [citations omitted] *So long as sales were made upon that price basis, overpayments beyond that price basis were recoverable as having been made under the mistaken belief that the bills paid conformed to that price basis.* 34 N.E.2d at 514.

Where a contract is made requiring payment by reference to an objective standard outside its specific terms, excess payments rendered by mistake or miscalculation are recoverable. *Gulf Oil Corp. v. Lone Star Producing Co.*, 322 F.2d 28 (5th Cir. 1963), *Savage v. Crag Lumber Co.*, 177 Cal. App.2d 770, 2 Cal.Rptr. 498 (1960); *Gilmore v. Texas Co.*, 100 Fla. 169, 129 So. 587 (1930); *Smart v. Valencia*, 49 Nev. 411, 248 P. 46 (1926). The same principle applies where the *"agreement,"* rather than being a binding contract, constitutes a mere offer. *Kinsley v. Willis*, 120 Vt. 103, 132 A.2d 163, 167 (1957).

To be distinguished from such cases are those in which earlier general agreements are superseded by the terms of subsequent specific transactions. In the latter instance, knowledge of the price differential, and conscious acquiescence to it, is essential. *See, e. g., General Auto Sales Co. v. Capitol Motor Car Co.*, 131 Conn. 424, 40 A.2d 767 (1945); *Gulf Oil Corp. v. Lone Star Producing Co., supra* at 31 (dictum).

Appellee testified that, largely because of his ill health, he did not closely examine the invoices to insure that they conformed to the agreed-upon formula. Such bookkeeping as was done, the referee found, was done by appellee's wife. Primarily, both husband and wife relied upon appellant to charge in accordance with its Agreement. While this may amount to negligence on appellee's part, it will not necessarily deny him recovery. In an appropriate case it may be considered in determining the equities between the parties and may reduce the amount of recovery. *Restatement of Restitution*, § 18c. As the court observed in *Gulf Oil Corp., supra* : [*t*]*he payor may recover though he had the means of knowing the facts at the time, where he did not have actual knowledge of them, unless the payment was made intentionally and in circumstances showing a determination to pay without choosing to in-*

---

4. In determining the respective rights of the parties, we pay particular heed to their conduct, as indicative of their intent. *See* 11 M.R. S.A. §§ 2–208(2) and 2–208(3).

5. The proposal was in fact unauthorized by defendant, but was within the scope of its agent's apparent authority.

vestigate the facts. *Negligence in paying does not give the payee the right to retain what was not his due, unless he was misled or prejudiced by the mistake.* 322 F.2d at 32.

We are unable to find such a knowing waiver by appellee in paying according to the face of the invoices. Waiver requires a showing of an *"intentional relinquishment of a known right"*. *Pino v. Maplewood Packing Co.*, Me., 375 A.2d 534, 538 (1977). Where, as here, an intention to waive is to be implied from conduct, the conduct must clearly bespeak that intention. *Bankers Trust Co. v. Pacific Employers Ins. Co.*, 282 F.2d 106 (9th Cir. 1960), cert. den., 368 U.S. 822, 82 S.Ct. 41, 7 L.Ed.2d 27.

The referee below specifically found that appellee was unaware of the change in price formula made by appellant. The payment of invoices, under the assumption that they reflected a previously agreed-upon formula, is not conduct clearly indicative of an *"intentional relinquishment of a known right"*. *Pino v. Maplewood Packing Co., supra.*

Appellant further urges, however, that the invoices represent separate and independent contracts, the terms of which supersede any prior oral agreement which may have existed, irrespective of mistake or waiver.

Assuming that the invoices were representative of independent contracts, we cannot agree that the appeal should be sustained.

In *Nat Nal Service Stations v. Wolf*, 108 N.Y.S.2d 816, 279 App.Div. 206 (1951) defendant orally agreed that so long as plaintiff purchased gasoline through defendants, defendants would pay plaintiff the discount allowed defendants by their distributors. Plaintiff sued to recover such discounts alleged to have been unpaid. Defendant's motion for summary judgment was granted on the ground that this alleged a contract within the one year clause of the Statute of Frauds.

The Court of Appeals reversed, 304 N.Y. 332, 107 N.E.2d 473 (1952), on the grounds that the agreement, being terminable at will, did not of necessity extend beyond one year from the time of its making.

Commenting upon this case, Professor Corbin observed that the *"agreement"* was wholly lacking consideration, being a mere exchange of illusory promises. Thus, plaintiff was not obliged to buy any gasoline, and defendant was not obliged to pay the promised discount, since it could simply refuse to accept plaintiff's order. However, Corbin noted, the *acceptance* by defendant of such an order

> would, in the absence of a notice to the contrary, *consummate a contract for the amount of gasoline then ordered and would incorporate the former promise to pay the discount with the illusion-producing factor eliminated.* 1A *Corbin on Contracts* (1963) § 157, n. 38 (Emphasis supplied).

The New York Court of Appeals endorsed this view in reversing the Appellate Division; that the subsequent contracts were *"separate"* did not obliterate the operation of the earlier agreement.

> *Each time the plaintiff offered to buy gasoline from defendants and the defendants accepted the offer and sold gasoline, there was concluded a separate contract and there became due from defendants the discount specified . . . .. When defendants accepted an order placed by plaintiff they became bound to grant the discount. [D]efendants were free at any and all times to discontinue payment of a discount either by refusing to accept an order or by notification to plaintiff that thenceforth no discounts would be paid.* 107 N.E.2d at 475.

The 1967 Agreement contemplated performance in successive installments, with no specified termination date. The provisions of 11 M.R.S.A. § 2–309(2) are therefore, applicable:

> *Where the contract provides for successive performance but is infinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.*

From this section Agway concludes that by charging for feed at a rate greater than that provided for in the 1967 Agreement, it exercised its option to terminate.

We do not agree.

11 M.R.S.A. § 2–309(3) provides that: *Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party . . .*

We are not persuaded by appellants' argument that the price differential between that stated on the invoices and that listed on wholesale price lists constituted *"all the notice of price changes a merchant could reasonably expect to receive."*

 The notice of termination requirement follows naturally from the requirement of good faith imposed by 11 M.R.S.A. § 1–203. The termination of a continuing commercial relationship will ordinarily compel the other party to seek substitute arrangements, and both good faith and sound commercial practice dictates that the party affected by the termination be afforded an opportunity to make such arrangements.

We note that the 1967 Agreement consisted of two basic parts: the 2% cash payment discount, and the formula for computing the price of No. 9 scratch. Both were concededly subject to termination at will. The referee found that when Agway discontinued its cash discount policy it mailed notices to that effect to Ernst and its other customers, and simultaneously removed the advisement of discount from the face of its invoices. The referee held that notice to be an effective termination of that aspect of the Agreement.

No such notice was given with respect to a change in the scratch feed pricing formula. Additionally, Agway discontinued Wirthmore's practice of sending Ernst wholesale price lists on a regular basis, which the referee found to have prevented Ernst from recognizing that he was being overcharged until 1971.

The existence of *"reasonable notice"* as required by § 2–309(3) is a necessarily factual issue.[6] The referee's finding that such notice was provided only with respect to the 2% cash discount is not clearly erroneous and will not be disturbed. M.R.Civ.P., Rule 52(b).

*"Reasonable notice"* of Agway's intention to terminate the 1967 pricing Agreement not having been given, its acceptance of orders by Ernst obligated Agway to bill in accordance with the Agreement. Money paid in excess of that due under properly computed invoices may be recovered.

Appellant raises several other issues respecting, *inter alia*, aspects of estoppel, parol evidence, and the Statute of Frauds. Suffice it to say that we have considered each contention at length, and find them to be without merit.

Finding no error below, the entry must be and is:

Appeal denied; Judgment for appellee on his counterclaim affirmed.

McKUSICK, C. J., did not sit.

DELAHANTY, J., sat at oral argument, but participated no further.

WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ., concurring.

---

6. See 11 M.R.S.A. § 1–201(25) and Comments, as respects the Code definition of '*notice*'.