**DIVERSIFIED FOODS, INC., et al.**

v.

**The FIRST NATIONAL BANK OF BOSTON, et al.**

Supreme Judicial Court of Maine.

Argued March 20, 1992.
Decided April 22, 1992.

Richard E. Poulos (orally), John S. Campbell, Poulos, Campbell & Zendzian, Portland, for appellants.

William J. Kayatta, Jr. (orally), Peter W. Culley, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, for appellee.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD and COLLINS, JJ.

COLLINS, Justice.

Diversified Foods, Inc. (DFI), New England Sales, Inc. (NES) and Ronald C. Giguere (collectively "the Borrowers") appeal from a summary judgment of the Superior Court (Cumberland County, *Lipez, J.*) entered in favor of Casco Northern Bank and First National Bank of Boston ("the Banks"). After the Borrowers filed a complaint alleging various contract and tort claims, the Banks counterclaimed, seeking to collect on the notes which formed the basis of the Borrowers' claim. The court granted summary judgment to the Banks as to all counts of the Borrowers' com-

plaint and as to liability on the Banks' counterclaim. The Borrowers also appeal from two other court orders, one denying them leave to amend their complaint, the other excluding a proposed expert witness. Finding no error in the Superior Court's well reasoned decisions, we affirm.

The facts developed for purposes of the motion for summary judgment are as follows: NES, a wholly owned subsidiary of DFI, marketed nonperishable food, grocery and beauty items to wholesalers and retailers throughout the United States. In October of 1987, the parties entered into a two million dollar, two-year term loan agreement ("Term Loan"). At the same time, the Banks extended to the Borrowers a twenty million dollar line of credit ("Revolver"). The terms of both credit arrangements appeared in the "Loan Agreement". It provided, *inter alia*, that the amount of credit extended under the Revolver was to be based on "eligible inventory", determined by the Banks in their sole discretion, and that all outstanding amounts were payable on demand or in the event of default. Both instruments specified rates of interest and the Term Loan also required a payment based on NES's earnings before interest and taxes. ("EBIT component").

For a short time, the parties abided by the Loan Agreement without incident. During this period, the Banks advanced funds based on all of NES's inventory (without exercising its discretion to exclude any); *once inventory was purchased with the Banks' approval, it was thereafter included in the inventory base.*

In early 1988, Giguere decided to expand his business into the distribution of computers. The Banks provided a letter of credit that allowed NES to acquire an initial shipment of lap top computers. They did not tell Giguere that the computers would be treated differently from other inventory. Although the parties considered this initial purchase a "one shot deal," NES soon approached the Banks about financing further computer ventures under the Revolver. The Banks' analysis indicated that such an investment involved a high degree of risk.

By the end of April, Giguere was aware that the Banks would not provide permanent financing for the computers. NES began approaching other banks about financing. The Banks discouraged Giguere from refinancing elsewhere by noting that the Loan Agreement prohibited prepayment and that the computer financing problems could be worked out; they continued to include the computers in the Revolver's inventory base.

In early June, officials from the Banks met with NES's Chief Financial Officer and told him they had decided to remove the computers from the Revolver's inventory base. At that time, the Banks realized that title to the computers had been transferred to SSI, a 75% subsidiary of DFI, not NES. This concerned the Banks because it violated the covenant against loans to affiliates and because the Banks had no security interest in SSI's assets. Following the June meeting, NES sent the Banks a "compliance certificate" letter, detailing the company's breaches of the loan agreement. In response, the Banks sent NES a letter waiving those breaches for the quarter ended April 30, 1988 and setting out their understanding that NES would abide by the terms of an earlier Bank letter (which provided that NES would find other financing for the computers within 30 days) and that the advances to affiliates would be paid off within six months.

In August, NES found that it was unable to secure outside financing for the computers. Despite the computer problems, NES reported record monthly sales and profits in August. In a September 6 letter, NES acknowledged that the computer overloan still existed and that advances to affiliates had increased. Giguere met with the Banks to discuss several proposals for addressing the computer financing and intercompany loan situations. The Banks informed NES that they would not include the computers in the collateral base for the Loan Agreement.

The Banks advised Giguere that financing would continue under the Revolver, but

required a repayment of the computer overloan and additional security interests. As a result, the Banks' risk was decreased, but NES had to curtail operations. NES reported a sharp decline in profits in September. Despite the downturn, the Banks assured Giguere that they were not in an "exit mode" and would continue to provide financing.

In December of 1988, DFI announced a third quarter net loss. Bank officials again met with Giguere. Although the computer overloan had been fully remedied, NES was still in default under a number of covenants, including advances to affiliates. Giguere assured the Banks that NES would eliminate the intercompany advances. In a January 10, 1989 letter, the President of Casco Bank reiterated that they were not in an "exit mode."

In mid-January, NES informed the Bank that DFI expected to show a small year-end profit for 1989. Due to tax adjustments, DFI reported a loss of over two million dollars, about $700,000 of which was attributable to NES. On May 4, 1989, the Borrowers delivered a letter to Casco Bank setting forth a dozen violations of the Loan Agreement. Four days later, the Banks entered an "exit mode" and transferred the account to their asset recovery divisions. Finally, in July, the Banks issued a written demand for payment in full of the loans based on the defaults noted above.

Summary judgment is properly granted when the record reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. M.R.Civ.P. 56(c). We review the Superior Court's decision for errors of law, viewing the record in the light most favorable to the non-moving party. *St. Louis v. Hartley's Oldsmobile–GMC, Inc.,* 570 A.2d 1213, 1215 (Me.1990).

### I.

■ The Borrowers contend that the Superior Court erred by excluding certain portions of its Rule 7(d) statement of material facts ("SMF") from consideration on the motion for summary judgment. M.R.Civ.P. 7(d)(2) requires a party opposing a summary judgment to file "a separate, short and concise statement of the material facts, *supported by appropriate record references,* as to which it is contended that there exists a genuine issue to be tried." M.R.Civ.P. 7(d)(2) (emphasis added). Rather than referring to external affidavits, the Borrowers attempted to convert material portions of their SMF into an affidavit. In addition to this technical noncompliance, some of the statements attested to are not the proper subject of an affidavit. Many of these statements could not have been based on Giguere's personal knowledge. M.R.Civ.P. 56(e); *Lindsley v. Lindsley,* 390 A.2d 512, 513 n. 1 (Me.1978). Others consist of legal arguments and conclusions rather than factual allegations. *Town of Orient v. Dwyer,* 490 A.2d 660, 662 (Me.1985). The court reviewed the record and properly excluded such statements from consideration.

### II.

■ The Borrowers also contest the Superior Court's conclusion that the Banks did not, as a matter of law, breach the Loan Agreement by reclassifying the computer inventory so that it was no longer part of the lending base. They argue that both contractual and implied duties prevented the bank from reclassifying inventory or at least obliged them to provide adequate notice of such a reclassification.

The Loan Agreement, on its face, neither precludes the Banks from reclassifying inventory, nor requires them to provide notice of any such reclassification. In fact, the Loan Agreement allows the Banks, at their "sole discretion," to loan on a percentage of eligible inventory. The Agreement gives them sole discretion to determine eligible inventory and the right to '*subtract*' any inventory which they deem ineligible for any reason. Moreover, the Loan Agreement contemplates using only NES's inventory, not computers owned by SSI. The Loan Agreement also provides the Banks with the option to call the outstanding loan "on demand" and without notice. There is simply no basis in the Agreement

for contesting the Banks' actions. Nor is there any ambiguity in its terms.[1]

▮ The Borrowers claim that the parties' course of dealing modified the contract to require notice and precluded the Banks from reclassifying inventory out of the lending base. The record indicates that the Banks had not previously reclassified items from the eligible inventory base, nor called the loans despite NES's breaches. The Agreement provided that any modification must be in writing and contained an anti-waiver provision, stating that the Banks would not be deemed to have waived any default by inaction. Therefore, the course of dealing cannot have precluded the Banks from exercising its contractual rights. *Kirkham v. Hansen*, 583 A.2d 1026, 1027 (Me.1990). Although a course of dealing is relevant to construing ambiguous contractual language, *Blue Rock Industries v. Raymond Intern. Inc.*, 325 A.2d 66 (Me.1974), the Borrowers have not shown any ambiguity in the language.

▮ The Borrowers contend that, even if the Banks did not violate the terms of the Loan Agreement as allegedly modified by their course of dealing, they breached an implied duty of good faith. The Superior Court correctly concluded that the Uniform Commercial Code, § 1–203, imposed such a duty of good faith upon the Banks, requiring "honesty in fact in the conduct or transaction concerned." 11 M.R.S.A. §§ 1–203,[2] 1–201(19) (1964); *see Reid v. Key Bank of Southern Maine, Inc.*, 821 F.2d 9, 14–15 (1st Cir.1987). The Borrowers contend that the Banks were also subject to an objective "good faith" duty to act in a commercially reasonable manner.

▮ The U.C.C. does impose the more onerous duty of objective good faith in certain situations.[3] *See* §§ 2–103, 3–406, 3–419(3) and 9–318(2). The Borrowers contend that Article 4 extends such a duty to all bank activities.[4] Article 4 does incorporate notions of "ordinary care," but is limited to issues of bank deposits and collections. The Borrowers allege no violations of the Banks' deposit and collection duties. We decline to extend the duty beyond its statutory scope.

▮ Section 1–208 of the U.C.C.[5] has also been interpreted as requiring objective good faith, including commercially reasonable behavior, on the part of lending institutions when exercising provisions of an agreement allowing them to accelerate payment on a note. *See e.g., K.M.C. Co. v.*

---

**1.** In arguing that the contract is ambiguous, the Borrowers do not point to specific provisions. Rather, they claim that lack of certain provisions, e.g. one for providing notice of inventory reclassification or how an "overloan" is to be repaid, create some ambiguity as to the Banks' rights. That the Borrowers can, *ex post*, conceive of additional terms to regulate the Banks' exercise of their rights does not render the terms creating those rights ambiguous.

**2.** Citing, *Agway v. Ernst*, 394 A.2d 774 (Me. 1978), the Borrowers contend that this general requirement of good faith in contractual dealings, alone, carries with it a duty of notification before terminating a relationship. In *Agway*, we stated, "the notice of termination requirement follows naturally from the requirement of good faith imposed by 11 M.R.S.A. § 1–203." *Id.* at 779. *Agway*, however, treated a notice requirement imposed by an entirely different section, § 2–309(3), pertaining to merchants and is inapplicable here.

**3.** The drafters of the code attempted to define the general good faith obligation of § 1–203 as honesty in fact *and* commercial reasonableness. Due to opposition from the ABA, the definition was modified to encompass only honesty in fact. *See* 58 Col.L.Rev. 798, 812 (1958).

**4.** 11 M.R.S.A. § 4–103(1) provides,

> (1) The effect of the provisions of this Article may be varied by agreement, except that no agreement can disclaim a bank's responsibility or its own lack of good faith or failure to exercise ordinary care ...; but the parties may by agreement determine the standards by which such responsibility is to be measured, if such standards are not manifestly unreasonable.

We cannot accept the Borrowers' argument that our opinion in *C–K Enterprises v. Depositors Trust Co.*, 438 A.2d 262, 264 (Me.1981), extends that duty to all bank activities.

**5.** 11 M.R.S.A. § 1–208 provides,

> A term providing that one party ... may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired.

*Irving Trust Co.,* 757 F.2d 752, 760–761 (6th Cir.1985). However, the Official Comment to the section explicitly states that the provision does not apply to demand instruments. The Superior Court correctly concluded that the Revolver was purely a demand instrument [6] and that the § 1–208 duty was, therefore, inapplicable.

The Borrowers also contend that a general common law duty of objective good faith and fair dealing governs this case. They assert that if the Banks have "sole discretion" to determine the lending base, the contract is illusory and must be regulated by good faith. *See Wickham & Burton Coal, Co. v. Farmers' Lumber Co.,* 189 Iowa 1183, 179 N.W. 417, 419 (1920); *Centronics Corp. v. Genicom Corp.,* 132 N.H. 133, 562 A.2d 187 (1989). However, they cite no Maine case law and ignore the context of the lender and borrower relationship (demand notes are not generally illusory). We decline to extend the common law notion of objective good faith to cover this contract.[7]

The Superior Court correctly concluded that the record (viewed in the light most favorable to the Borrowers) discloses no facts "which directly, or through inference indicate that the Banks acted dishonestly, with ulterior motives, or for anything other than business reasons in exercising their rights under the loan agreement." *See Reid,* 821 F.2d at 15 (objective good faith defined). Even the Borrowers themselves do not argue that the inventory reclassification involved dishonesty. They assert, instead, that the Bank's alleged failure to provide adequate notice evinces ill motiva-

tion.[8] The record reveals that the Borrowers were aware of the Banks' unwillingness to finance the computer inventory and were in default, triggering the Banks' contractual rights to demand repayment. These circumstances simply do not support a rational inference of improper motivation.

### III.

The Borrowers contend that they have raised genuine issues of material fact as to whether the Banks violated the Article 9 duty of good faith. However, they have failed to mention any provision of Article 9 which might have been violated. Article 9 does, indeed, impose a duty of commercially reasonable behavior upon a secured party when disposing of collateral. *See* 11 M.R.S.A. § 9–504. However, neither the record nor the Borrowers' brief suggests that the Banks disposed of any collateral. Section 9–504 applies only where the secured party effects the sale. *See Watseka First National Bank v. Ruda,* 135 Ill.2d 140, 142 Ill.Dec. 184, 191, 552 N.E.2d 775, 782 (1990).

### IV.

The Borrowers contest the Superior Court's conclusion that there was no confidential relation, thus no breach of fiduciary duty.

The salient elements of a confidential relation are the actual placing of trust or confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation.

*Ruebsamen v. Maddocks,* 340 A.2d 31, 35 (Me.1975). Such a relationship would im-

---

6. The *Reid* court applied § 1–208 to a note stating that it was payable "on demand" because it found that the note was actually a term note. That note provided that it could be called only after a specified date and pursuant to certain events of default. 821 F.2d at 13–14. Although the note at issue also defines events of default, it expressly states that those provisions do not change its "demand" nature.

7. The Borrowers' rely on *Schiavi Mobile Homes, Inc. v. Gironda,* 463 A.2d 722 (Me.1983), to support their argument for extending the common

law duty of good faith and fair dealing to the instant situation; however, that case deals only with mitigation of damages and does not extend the common law duties beyond that context. *Id.* at 724–25.

8. The *Reid* court, 821 F.2d at 15, held that terminating credit without notice violated even the subjective good faith duty. Here, however, the Borrowers were admittedly in default, and the Bank could call in funds "on demand."

pose fiduciary duties upon the "superior" party. We have stressed the difficulty of sustaining the burden of establishing such a relation. *Id.*

Instead of addressing the two prongs of the *Ruebsamen* test, the Borrowers claim that such a relationship arises in similar commercial ventures. *See Dalton v. Austin,* 432 A.2d 774, 775 (Me.1981) (Partners owe duty to partnership); *Willman & Associates v. Penseiro,* 158 Me. 1, 176 A.2d 739 (1962) (joint venturers owe each other fiduciary duty). However, the "equity interest" in the EBIT provision of the Term Loan did not make the Banks a joint venturer or partner. While this provision allowed the Banks to share in the Borrowers' profits, it did not invest them with control over the Borrowers' business. Nor did the Banks' discretion in setting the loan amount give them control over the Borrowers' day to day operations. *See Reid,* 821 F.2d at 17–18.

■ The Borrowers cite cases, from other jurisdictions, that hold banks to a fiduciary duty toward bankrupt debtors. However, the holdings in those cases were limited to factual situations in which the banks took almost complete control over the business. *See e.g., Matter of Teltronics Services Inc.,* 29 B.R. 139, 172 (E.D.N.Y.1983) (restrictions on outside financing and monitoring debtor's finances is not control); *In re American Lumber Co.,* 5 B.R. 470, 478 (D.Minn.1980) (taking over receipt of accounts, selective payment of creditors and hiring and firing employees is control).

Although the Borrowers have not addressed the *Ruebsamen* test, the record does not support a finding that the instant relationship meets either of the prongs. It is bereft of any facts indicating "diminished emotional or physical capacity or of the 'letting down of all guards and bars'" that defines 'disparity of position' in the context of a confidential relation. *Reid v. Key Bank of Southern Maine,* 821 F.2d 9, 18 (1st Cir.1987). Nor could the Borrowers claim that they invested trust and confidence in the Banks. Therefore, the Superior Court committed no error.

## V.

The Borrowers' contest the Superior Court's grant of summary judgment on their claims of fraudulent and negligent misrepresentation. Essentially, the court could find no support in the record for the most basic, common element of the two issues, a false representation. The Borrowers claim that the Banks misstated their position by asserting that (1) financing would continue after the computer overloan was repaid and (2) they were not in an "exit mode."

[10] Common law fraud requires:

(1) a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*Butler v. Poulin,* 500 A.2d 257, 260 (Me. 1985). The *Restatement (Second) of Torts,* § 552(1), definition of negligent misrepresentation, as adopted in Maine, also requires the supplying of false information. *Chapman v. Rideout,* 568 A.2d 829, 830 (Me.1990).

As the Superior Court correctly concluded, the record does not indicate that either of the positions taken misrepresented the Banks' position. The Borrowers offer no record evidence that the Banks intended to discontinue financing once the overloan was repaid. Indeed, financing continued for about six months after the overloan was remedied and the Borrowers were in default under other provisions when the loan was called.

The Banks repeatedly assured the Borrowers that they were not in an "exit mode" from September to May. The Borrowers, however, have provided no evidence that the Banks were in an "exit

mode." Taken in context, the memo on which the Borrowers rely raises no such inference.[9] The Banks' efforts to secure a pay-down of the loan balance and additional security interests in no way indicate that they had entered an "exit mode."

Because the record raises no genuine issue that the Banks made a false statement, the Superior Court correctly granted summary judgment on both misrepresentation claims.

## VI.

The Borrowers claim that the Superior Court erred in granting summary judgment on the Banks' counterclaims against them. They claim that there were genuine issues of material fact regarding their affirmative defenses. Specifically, they contend that their defaults were occasioned by the Banks' breaches of the agreement and the duty of good faith.

■■■ The doctrine of prevention or hindrance excuses a borrower's breach that is caused by a lender's breach of its duties. *Restatement (Second) Contracts*, § 225, comment b, at 166 (1981); *Motel Services v. Central Maine Power*, 394 A.2d 786, 788 (Me.1978). Because the Banks violated no duty (contractual or implied), the entry of summary judgment in their favor on their counterclaims was appropriate.

## VII.

The Borrowers also contend that their motion to amend, filed more than a month after summary judgment was entered, was improperly denied. The Borrowers sought to add a number of federal claims, already pending in Federal District Court, to the state action.

■■■ Whether to allow a pleading amendment rests with the court's sound discretion. *Miller v. Szelenyi*, 546 A.2d

1013, 1022 (Me.1988); *Bangor Motor Co. v. Chapman*, 452 A.2d 389, 392 (Me.1982). M.R.Civ.P. 15(a) provides that leave to amend should be freely given when justice so requires. *See also Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). This mandate means that "(i)f the moving party is not acting in bad faith or for delay, the motion will be granted in the absence of undue prejudice." 1 Field, McKusick & Wroth, § 15.4; *Bangor Motor Co.*, 452 A.2d at 392.

■■■ The Borrowers contend that the Superior Court failed to consider all three relevant factors, bad faith, delay and prejudice. Although passage of time, alone, is not grounds for denying a motion to amend, *see Young v. Greater Portland Transit District*, 535 A.2d 417, 418 n. 1. (Me.1987); "undue delay" removes any presumption in favor of allowing amendment. Moreover, when summary judgment has been entered, the court should be reluctant to allow the addition of a new cause of action, particularly when the delay is unexplained. *Dugan v. Martel*, 588 A.2d 744, 747 (Me.1991).

The Superior Court correctly noted that the Borrowers knew the Banks would contest their bringing some claims in state and some in federal courts at least seven months earlier because the Banks had raised claim splitting as an affirmative defense in federal court. It noted that the Borrowers had eschewed any intent to incorporate these claims on its previous motion to amend the state complaint. Such undue delay certainly supports the court's decision to deny leave to amend the complaint.

The Borrowers suggest that the court's mention of comity constitutes reversible error. The mention of comity does not taint a decision properly supported on the grounds of undue delay.

---

**9.** The memo reads,

Although our current plan is to remain in a "maintain" mode with NES, the $500M reduction in our total O/A during the next six months will put us in a better position to exit this credit should such a decision become warranted.

## VIII.

The Borrowers' final contention is that the Superior Court erred by excluding the testimony of William Bullock, a proposed expert witness.  Because we conclude that the motion for summary judgment was properly granted, we need not address this issue concerning who would be permitted to testify at trial.

The entry is:

Judgment affirmed.

All concurring.