STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-99-126

POF - YOP - 12/23/2002

ARTHUR K. KYRICOS and
CRYSTAL S. KYRICOS,

Plaintiffs

v.

KENNEBUNK SAVINGS BANK,

Defendant

ORDER

DONALD L. GARBRECHT
LAW LIBRARY

JAN 21 2003

The defendant has filed a motion for reconsideration of order on defendant's motion for summary judgment. The motion is based on the Law Court's decision of July 30, 2002 in *Myshrall v. Key Bank National Association*, 2002 ME 118.

After a review of that decision and the Superior Court decision in the same case, the defendant's motion will be granted in part. The federal law cited in *Myshrall*, ¶ 19, is 15 U.S.C §1681h(e), which states, in part, that ". . . no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information. . . ."

Judgment will be entered for the defendant on Count I of the complaint (negligence), Count II (negligent misrepresentation) and Count III (interference with beneficial relations). Counts IV, VII and VIII do not appear to be barred by the federal law or *Myshrall* and shall proceed to trial.

The entry is:

> Defendant's motion for reconsideration of order on defendant's motion for summary judgment is granted in part. Judgment for the defendant on Counts I, II and III of the complaint.

Dated:     December 23, 2002

_____
Paul A. Fritzsche
Justice, Superior Court

Leonard M. Gulino, Esq. - PLS
James Bowie, Esq. - DEF

STATE OF MAINE
YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-99-126
TEH-YOR-11/20/2003

ARTHUR K. KYRICOS and
CRYSTAL KYRICOS,

Plaintiffs

v.

DECISION AND ORDER

DONALD L. ░░░░░░░░
LAW LIBRARY

KENNEBUNK SAVINGS BANK,

Defendant

NOV 21 2003

This matter was tried before the court on the remaining counts of the plaintiffs' complaint alleging breach of contract (Count IV), breach of implied duty of good faith and fair dealing (Count VII), and promissory estoppel (Count VIII).

Between 1988 and 1990, the plaintiffs entered into three separate commercial loan obligations with the defendant (collectively, "Loan Obligations"). The first was a note, dated May 6, 1988, in the original principal amount of $110,000 and secured by a mortgage on the plaintiff's business premises in Wells, Maine. The second was a note, dated August 25, 1988, in the original principal amount of $350,000 and secured by a mortgage on the plaintiffs' personal residence in York, Maine. The third was a note given by the plaintiff Arthur Kyricos, individually, and Crytsal Kyricos, in her capacity as Trustee of the Kyricos Family Realty Trust, dated February 12, 1990, in the original principal amount of $380,000 and secured by the plaintiffs' York residence.

1

In July 1991 the plaintiffs filed for Chapter 11 bankruptcy. In December 1992 the bankruptcy action was converted to a Chapter 7 proceeding. In 1993 the plaintiffs sought to reconvert the case to Chapter 11, but the defendant objected to the reconversion. Thereafter, the defendant withdrew its objection and supported an amended plan of reorganization in return for the plaintiffs' written assurances regarding the amount, validity, priority, and enforceability of the Loan Obligations, all as set forth in a Stipulation and Agreement ("Stipulation"), which was approved by the Bankruptcy Court on February 23, 1993. (Exhibit 106). The amended plan of reorganization allowed the plaintiffs to keep their York residence and their business properties.

Among other things, the Stipulation confirmed that as of December 15, 1992, the plaintiffs' aggregate personal liability under the Loan Obligations was $512,922.96, plus costs and attorneys' fees. The Stipulation also provided that the plaintiffs would give the defendant an assignment of leases, rentals and other payments to secure that indebtedness.

In May 1993 the Stipulation was amended to replace a provision regarding environmental issues affecting the Wells property, and to extend deadlines in order to allow the plaintiffs to consummate the pending Chapter 11 plan ("Amendment"). (Exhibit 107). That same month, the plaintiffs leased the Wells property to Sesco Convenience Corp. (Sesco), which operated a business there under the name Sesco Convenience Store. The plaintiff Crystal Kyricos was employed by Sesco and managed the store from 1993 to 1995.

The plaintiffs also executed an Assignment of Leases and Other Rights to Payment to the defendant, which included rents and other payments from Sesco under the lease and under a non-competition agreement totaling the fixed amount of $3,500 per month ("Assignment"). (Exhibit 153). The Assignment gave the defendants the right "without notice" to require Sesco to make its monthly payments directly to the defendant. However, the exercise of that right did not relieve the plaintiffs of their obligations under the Stipulation and the Loan Documents, including that of making timely payments.

The Assignment provided that "[a]ny, notice, demand, or communication to be given to" the plaintiffs under the Assignment should be in writing and sent by regular or certified mail to the plaintiffs at their York residence address. *Id.* at ¶ 15. However, it did not expressly require the defendant to give any notices to the plaintiffs, and expressly provided that notice was not required in certain circumstances.

Beginning in June 1993, the defendant exercised its right under the Assignment to require Sesco to make its fixed monthly payments of $3,500 directly to the bank. The payments were applied to the plaintiffs' three Loan Obligations with the defendant and to another loan from the plaintiffs to Wayne and Kathleen Chase ("Chase Loan") in an order of priority outlined in the Stipulation. Exhibit 106 at ¶ 23. However, the amount of Sesco's monthly payments was less than the total of the plaintiffs' monthly obligations due under the Loan Obligations and the Chase Loan.

3

The plaintiffs' Loan Obligations were placed with the defendant's Special Assets Department, which oversaw problem loans. The department was headed by Donna DeSaulnier. Beginning in June 1993, the defendant sent the plaintiffs copies of the bank's written internal accounting notes, called Payment Accounting Reports, reflecting how Sesco's rental payments were applied to the loans. This reporting process was unusual and cumbersome for the defendant and, by 1995, the bank stopped providing such reports to the plaintiffs. Thereafter, Ms. DeSaulnier informed the plaintiffs that she would verbally notify the plaintiffs if Sesco had not made a direct monthly payment.

On September 15, 1993, the plaintiffs' Loan Obligations were put on an "accrual status" – meaning, they were not considered problem loans. As of August 10, 1995, the plaintiffs were current on the Loan Obligations. Several times in 1996 and 1997, Sesco failed to timely submit its monthly payments to the defendant. When that happened, Ms. DeSaulnier often notified Arthur Kyricos by phone.

The defendant stored all of its loan accounts information on a single computer system. Each month, that system generated and automatically sent a loan accounting system report, called a LAS, to credit bureaus. It was a computer to computer transfer. The LAS contained the current status of the bank's loans and it was the only information that the defendant sent to credit bureaus.

In January 1997, Mr. Kyricos informed Donna DeSaulnier that credit reporting agencies had reports for him showing that his loan payments to the defendant were late. That same month, Ms. DeSaulnier

4

sent a letter to the plaintiffs indicating that they had missed several payments in 1996 and they needed to bring their account up to date. Nevertheless, as of March 31, 1997, the Loan Obligations retained their accrual status on the defendant's records.

The plaintiffs also had an outstanding loan with Fleet Bank in excess of $462,000. Mr. Kyricos had several discussions with Edmond Giorgio, a workout officer in Fleet's managed assets division, about resolving the plaintiffs' relationship with Fleet. On November 18, 1996, Arthur Kyricos submitted a proposal to Mr. Giorgio offering to settle the Fleet Bank loan for the takeout sum of $200,000. In June 1997, Fleet rejected the proposal as unrealistic. (Exhibit 43). Eventually, the plaintiffs obtained sufficient financing to effect a takeout of the Fleet loan for $330,000.

In early 1997, when the plaintiffs were still attempting to refinance the Fleet loan, Mr. Kyricos met with a loan broker, who negotiated on their behalf with First Bankers Mortgage, a Florida lender. In April 1997, the plaintiffs submitted an application to First Bankers for a $330,000 loan. On June 9, 1997, the defendant received a fax note from Dan Phelan of First Bankers concerning the plaintiffs' credit history with the defendant. This was the first and only time that anyone had ever requested credit information from the defendant about the plaintiffs. The plaintiffs were aware of Mr. Phelan's inquiry and the defendant's letter of reply. Ultimately, First Bankers did not approve the plaintiffs' application.

Under the terms of the Stipulation, the Loan Obligations were to be fully paid by March 1, 1998. In June 1998, the plaintiffs refinanced those obligations with the defendant.

## A. Breach of Contract

The plaintiffs assert that the Stipulation and the Assignment, together, constituted a contract between the parties. They allege that the defendant breached the contract (1) by failing to make all material communications to the plaintiffs, including notices, in writing mailed to them at their York residence address, as required by the Assignment, and (2) by failing to provide the plaintiffs with a detailed accounting of Sesco's monthly payment performance, as impliedly required by the contract. The court does not agree.

A legally binding agreement exists if the parties have mutually assented to be bound by all material terms of the agreement, the assent is manifested in the contract, either expressly or impliedly, and the contract is sufficiently definite to enable the court to determine its exact meaning and fix exactly the legal liabilities of the parties. *Stanton v Univ. of Maine Sys.*, 2001 ME 96, ¶ 13, 773 A.2d 1045, 1050-51.

The express language of the Stipulation and the Assignment did not require the defendant to notify the plaintiffs regarding the timeliness of the payments by Sesco or their receipt by the bank. The Stipulation unqualifiedly required the plaintiffs to make "full regular payments of principal and interest, each and every month, due and owing under the terms and conditions of the ... Loan Obligations, as amended, until such time as each of the Loan Obligations is paid in full." Exhibit 106 at ¶ 17.

6

It also provided that in the event the plaintiffs were in default of the Loan Obligations, the defendant had the right to exercise its collection rights and remedies "without notice or demand". *Id.* at ¶ 28. Direct payments by Sesco to the defendant under the Assignment did not vary or alter that requirement.

There is also no credible evidence, either direct or inferred, that there was an implied provision in either the Stipulation or the Assignment obligating the defendant to send to the plaintiffs the bank's written internal accounting notes reflecting how Sesco's monthly payments were applied to the loans. Implied provisions may be included in an agreement to the extent they are indispensable to effectuate the intention of the parties and are not inconsistent with the express terms of the contract. *Top of the Track Assocs. v. Lewiston Raceways, Inc.,* 654 A.2d 1293, 1295 (Me. 1995). Although an implied requirement that the defendant give its payment accounting notes to the plaintiff would not be inconsistent with the express terms of the Stipulation or the Assignment, neither would it be indispensable to the plaintiffs' ability to comply with their obligations under the loans and the workout documents. Sesco's monthly payment obligation was fixed and the plaintiffs could have ascertained the status of those payments from its tenant or from the bank. There was testimony that in 1995 Ms. DeSaulnier told Mr. Kyricos that she would verbally notify the plaintiffs if Sesco failed to make a direct payment. However, that discussion did not form an express or implied part of the contract documents entered into in 1993, nor did it constitute an amendment to that contract.

7

B.    Implied Duty of Good Faith and Fair Dealing

The plaintiffs claim that the defendant's reports to the credit bureaus constituted a breach of a duty of good faith and fair dealing. However, Maine does not recognize such a duty as between borrowers and lenders. *See Diversified Foods v. First Nat'l KSB of Boston*, 605 A.2d 609, 613 (Me. 1992); *see also* 11-A M.R.S.A. §§ 1-203 & 1-201(19).

There is no bright line as to precisely when Maine law implies a duty of good faith and fair dealing in contracts. The Uniform Consumer Code imposes such a duty on contracts within its scope. *See* 11-A M.R.S.A. §§ 1-203 & 1-201(19) (contracts governed by UCC include obligation of good faith, which requires "honesty in fact in the conduct or transaction concerned"); *see also Diversified Foods v. First Nat'l KSB of Boston*, 605 A.2d 609, 613 (Me. 1992). The Law Court has refused to extend the duties imposed by the UCC beyond their express statutory scope. *Id.*; *see also First N.H. Banks Granite State v. Scarborough*, 615 A.2d 248, 251 (Me. 1993). However, the UCC does not preempt the common law. 11 M.R.S.A. § 1-103; *see also*, Diversified Foods, 605 A.2d 614 n.7. Since the contract documents in the instant case, as well as the loan documents securing them, are commercial instruments and are not governed by the UCC, a duty of good faith will be implied only if it is recognized by the common law. *See* Restatement (Second) Of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement").

Maine's Federal District Court has interpreted *Diversified Foods* and *First N.H. Banks* as negating any implied common law duty of good

8

faith in Maine. *See People's Heritage Savings Bank v. Recoll Management*, 814 F. Supp. 159, 169 (D. Me. 1993). However, this court is unable to conclude that *Diversified Foods* or *First N.H. Banks* are that broad in scope. Rather, they appear to be limited to the facts of those cases. *Diversified Foods*, 605 A.2d at 614 ("We decline to extend the common law notion of objective good faith to this contract"); *First N.H. Banks*, 615 A.2d at 250-51.

The nature of contracts varies along a continuum with demand notes at one end and joint ventures at the other. No common law duty of objective good faith and fair dealing is implicit in a demand note. *Diversified Foods*, 605 A.2d at 614. Joint venture agreements, on the other hand, imply fiduciary responsibilities between the parties. *Simpson v. Richmond Worsted Spinning Co.*, 128 Me. 22, 31, 145 A. 250 (1929). Viewed in its entirety, the Stipulation and Assignment, together with the underlying Loan Documents, have more in common with a demand note than a joint venture. *See Nancy W. Bayley, Inc. v. Maine Employment Security Comm'n*, 472 A.2d 1374, 1377 (Me. 1984) (joint venture includes pooled resources and efforts to jointly seek profits); *Simpson*, 128 Me. at 30-31 (joint venture is a common undertaking for mutual benefit with a community of interest and sharing of profits and losses).

Given the nature of the documents constituting the contract in this case, this court is not prepared to state, as a matter of law, that a duty of good faith can be implied. Even if such a duty existed, the evidence is insufficient to support the plaintiffs' assertion that the defendant acted dishonestly, or that its reports to the credit bureaus were "dishonest in

9

fact", or that the defendant's alleged failure to provide an accounting of Sesco's payment performance or to consistently communicate with the plaintiffs by writings mailed to their York address the reflected an ill motive.

Finally, although First Bankers Mortgage did not extend financing to the plaintiffs in 1997 when the plaintiffs sought to refinance their Fleet Bank loans, there is no credible evidence that it or any other lender denied credit to the plaintiffs as a result of any statements or actions by or attributed to the defendants. However, there is evidence that the plaintiffs' credit report also contained information regarding their bankruptcy, tax liens, repossessions and other delinquencies, all or any part of which could have adversely impacted a lender view of the plaintiffs' credit worthiness. There is also evidence that by August 1997 the plaintiffs obtained loan commitments from two separate lenders, ICC and Southern Pacific Thrift & Loan.

C.    Promissory Estoppel

The Law Court has adopted the RESTATEMENT (SECOND) OF CONTRACTS formulation of the doctrine of promissory estoppel.

> A promise which the promissor should reasonably expect to induce action or forbearance on the part of the promissee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Daigle Commercial Group, Inc., v. St. Laurent*, 1999 ME  , ¶ , 734 A.2d 667, 672. The evidence in this case does not support a conclusion that there was a promise by the defendant to provide the plaintiffs with monthly statements regarding its receipt of Sesco's rent and other

payments. The court is mindful of testimony that Ms. DeSaulnier told the plaintiffs that she would verbally notify them if Sesco failed to make a direct monthly payment. However, that discussion did not rise to the level of a promise, and even if such a promise could be found, there is no credible evidence that it induced the plaintiffs not to pay the Loan Obligations on time or to take or forebear to take any other action such that the ends of justice require enforcement of the promise.

Finally, even if there was sufficient evidence that the defendant breached a contract with or an implied duty owed to the plaintiffs, or that the plaintiffs were induced to rely on a promise made by the defendant, there is no evidence that any such breach or inducement is causally connected to any damage that may have been sustained by the plaintiffs. The court agrees with the defendant that there is no evidence, but only speculation, that the plaintiffs suffered damages at all in their dealings with the defendant.[1] *Carter v. Williams*, 2002 ME 50, ¶ 9, 792 A.2d 1093, 1097 (citations omitted) ("Damages may not be awarded when the proof is speculative").

Based upon the foregoing, the court concludes that the plaintiffs have not sustained their burden with respect to their remaining claims in

---

[1] The plaintiffs claim to have been damaged in three ways. First, they claim their cost to finance the take out of the Fleet Bank loan was excessive. However, they did not present any evidence of other available and more favorable financing. Second, they claim to have lost the opportunity to refinance the Fleet Bank loan for $200,000 instead of $330,000. However, this court has already concluded that the plaintiffs never had, and therefore never lost, such an opportunity. Finally, the plaintiffs claim to have incurred excessive interest when they refinanced the Loan Obligations with the defendant in 1998. However, there is no evidence of other alternative financing that would have been available to them, but for the actions of the defendant.

11

this action.  Pursuant to M.R. Civ. P. 79(a), the Clerk is directed to enter this Order on the Civil Docket by a notation incorporating it by reference and the entry is

> Judgment for Defendant on the remaining Counts IV, VII and VIII of Plaintiffs' Complaint.

Dated: November 20, 2003

_____
Justice, Superior Court

PLAINTIFFS:
Leonard M. Gulino, Esq.
Bernstein, Shur, Sawyer & Nelson
P.O. Box 9729
Portland ME   04104-5029

DEFENDANT:
James Bowie, Esq.
Thompson and Bowie
PO Box 4630
Portland ME   04112