

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-1996

# Ideal Dairy Farms v. John Labatt Ltd

Precedential or Non-Precedential:

Docket 95-5435

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Ideal Dairy Farms v. John Labatt Ltd" (1996). *1996 Decisions*. Paper 114.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/114

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5435


IDEAL DAIRY FARMS, INC.,

Appellant

v.

JOHN LABATT, LTD.; JOHN LABATT, INC.; TUSCAN DAIRY FARMS,
INC.; JOHANNA DAIRIES INCORPORATED; ROBERT FACCHINA;
ABC COMPANIES, 1 THROUGH X (FICTITIOUS NAMES OF LABATT
AFFILIATES THAT ACTIVELY PARTICIPATED IN THE
MONOPOLISTIC PRACTICES DESCRIBED BELOW, BUT WHOSE
IDENTITIES ARE PRESENTLY UNKNOWN); JOHN DOES, 1 THROUGH X
(FICTITIOUS NAMES OF OFFICERS AND/OR DIRECTORS OF THE
CORPORATE DEFENDANTS WHO ACTIVELY PARTICIPATED IN THE
DECISION-MAKING REGARDING THE MONOPOLISTIC PRACTICES
DESCRIBED BELOW, BUT WHOSE IDENTITIES ARE PRESENTLY
UNKNOWN); ELMHURST MILK & CREAM COMPANY, INC.;
LOCAL 584, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA,
AFL-CIO; HONEYWELL FARMS, INC., t/a ELMHURST DAIRY


TUSCAN DAIRY FARMS, INC.,

Defendant/Third-Party Plaintiff

v.

IDEAL DAIRY FARMS, INC.;
GILBERT LEVINE;
MARK GREENBERG,

Third-Party Defendants


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 92-cv-02469)

Argued May 3, 1996

Before: SCIRICA and ROTH, Circuit Judges
and GODBOLD, Circuit Judge


(Opinion Filed  July 24, l996)

Sheldon A. Weiss, Esq. (Argued)
225 Millburn Avenue
Suite 203
Millburn, NJ  07041

Steven Pasternak, Esq.
Pasternak, Feldman & Plutnick
70 South Orange Avenue
Eisenhower Plaza South, Suite 245
Livingston, NJ  07039

        Attorneys for Appellant

Thomas H. Moreland, Esq. (Argued)
Lawrence E. Jacobs, Esq.
Kramer, Levin, Naftalis, Nessen, Kamin & Frankel
919 Third Avenue
New York, NY  10022

        Attorney for Appellee Tuscan Dairy Farms

Frederick L. Whitmer, Esq.
Pitney, Hardin, Kipp & Szuch
P.O. Box 1945
Morristown, NJ  07962-1945

        Attorney for Appellees John Labatt Ltd.;
        John Labatt, Inc.; Johanna Dairies, Incorporated and
        Robert Facchina

OPINION OF THE COURT

ROTH, Circuit Judge:

The litigation giving rise to this appeal began when a locally owned dairy in Northern New Jersey sued a large Canadian corporation, its affiliates, and several New Jersey dairies purchased by the corporation in the 1980s. The plaintiff, Ideal Dairy Farms, Inc. ("Ideal"), filed a complaint that raised breach of contract, tort, fraud, RICO, and antitrust claims. One of the defendants, Tuscan Dairy Farms ("Tuscan"), filed a counterclaim against Ideal seeking payment of unpaid invoices totalling over $2 million.

After extensive discovery proceedings, defendants moved for summary judgment on their counterclaim and on all of Ideal's twenty-five claims. The district court granted summary judgment dismissing the claims against the defendants on the basis of its finding that Ideal failed to raise a genuine issue of material fact. It also granted summary judgment in favor of defendants on their counterclaim and awarded Tuscan $2,264,333.71. Ideal appealed the district court's summary judgment order.

With regard to Ideal's claims involving the 1985 supply contract between Tuscan and Ideal, we believe that Ideal has sufficiently demonstrated that genuine issues of material fact exist that preclude summary judgment. As a result, we will reverse and remand the following claims:

 (1) Breach of Contract (Eleventh Count);

 (2) Breach of Implied Covenant of Good Faith (Twelfth Count); and

 (3) Tortious Interference with Contract (Fourteenth Count).

With regard to all other remaining claims, we find that summary judgment was properly granted against Ideal. We will therefore affirm the district court's order dismissing all of the antitrust claims, the common law fraud and RICO claims, and the tort claims not involving the 1985 supply contract.

I.

The appellant, Ideal, is a New Jersey corporation owned by Mark Greenberg and Gil Levine. Ideal distributes processed dairy products to retail customers and to customers in the food service industry. In the mid-1980s, the Labatt corporation, a Canadian entity with major interests in the beer and dairy industries, began acquiring dairies in the United States. For example, in Northern New Jersey, Labatt acquired Tuscan and Johanna Dairy Farms ("Johanna"). Labatt also purchased smaller dairy plants in Northern New Jersey, which it either consolidated with other more efficient plants or shut down.

In 1985, Ideal found itself in need of a new processed milk supplier and entered into negotiations with Tuscan. Tuscan purchases raw dairy products from farmers and processes them for sale to retail and industrial customers, as well as to

distributors like Ideal.  At that time, Tuscan was owned by Lou Caiola.  Mr. Caiola submitted a proposed supply contract to Ideal for its consideration.  Joint App. 316-23 ("1985 contract").  Ideal had no part in the preparation of the contract and signed the contract without making any changes to the text.  The contract covered pricing and payment requirements but contained no clause providing for a term after which the contract would expire, nor did it discuss how the contract could be terminated.  Mark Greenberg admitted at his deposition that, when they signed the contract, he and Mr. Levine were aware that the contract had "no length" and that they were "satisfied with no period of time."  Joint App. 527 & 529.

The 1985 contract provided that "[a]ll milk and milk product prices [would be] based upon [the February 1985] Federal Milk Marketing Order."  See Joint App. 317 (1985 contract, paragraph 2).  The Federal Milk Marketing Order sets the minimum "Class I" price that a processor must pay to a farmer.  The contract further provided that future prices could be adjusted whenever the Department of Agriculture changed Class I prices and also when "documentable or industrywide cost[s]" increased or decreased.  Id.  Such price adjustments were to be "consistent with generally accepted industry practice."  Id.  In addition to those adjustments, the contract also allowed Tuscan to add "an additional amount equal to 10% of [any] increase or decrease" after April 1, 1986.  Id.

Labatt purchased Tuscan Dairy in December 1986.  Lou Caiola continued to manage Tuscan's business, however, until October 1987.  At that time, Herbert England, a Labatt employee, was appointed to replace Mr. Caiola.  England was in charge at Tuscan until 1988, when he was replaced by Robert Facchina who ran the business for the remainder of Tuscan's relationship with Ideal.

Every day, Ideal ordered products from Tuscan.  Every night, Tuscan loaded the order onto Ideal's trucks so that Ideal could deliver its cargo to customers the following morning.  Every week, Tuscan sent Ideal an invoice of its purchases.  Ideal responded by paying the invoices, meticulously subtracting for any product not received, or received but substandard.  Every month, for nearly seven years, Tuscan sent Ideal notice of any upcoming price changes.  Often these notices included a statement explaining the price changes and a newly revised price list of Tuscan's offerings.

Soon after it began doing business with Tuscan, Ideal realized that Tuscan was charging prices well above expected contract prices.  Beginning in 1987, Tuscan began steadily increasing prices, usually blaming the increases on various premiums charged by farmers, cooperatives, and state governments.  For example, Tuscan increased Ideal's prices in 1987 claiming that RCMA, a dairy farmers' cooperative, had increased the premium that it charged in addition to the Class I price.  Later, when RCMA reduced its premium, Ideal never received the benefit of the cost decrease.  Ideal discovered this overcharging by reading certain industry bulletins that publish actual changes in premiums charged by various raw milk suppliers.

Ideal first complained to Lou Caiola in 1987 that these price increases violated the terms of the 1985 contract, and for the next five years, Ideal continued to complain about the overcharges to Mr. Caiola's successors. At times, management at Tuscan promised that, if Ideal was patient, it would get the decrease that was due. At other times, Tuscan's management refused to discuss the issue.

At a meeting held on March 2, 1990, Tuscan's management attempted to rationalize its prices by comparing them, on a blackboard, to price increases authorized under the 1985 contract. In the end, Tuscan was unable to show on the blackboard that it had been increasing prices in compliance with the contract's pricing formula. Instead, the blackboard calculations highlighted the extent of Tuscan's overcharging. Mr. Facchina terminated the meeting and refused to discuss prices further.

Because Labatt owned all of the dairies capable of handling Ideal's supply needs, Mr. Greenberg and Mr. Levine believed that they were stuck with Tuscan. They doubted that they could obtain a better price elsewhere. Therefore, they concluded that they had no choice but to pay the overcharges. In addition, a New Jersey regulation hampered Ideal's ability to shop freely for a milk supplier who might offer a lower price. Section 2:52-3.1 of the New Jersey Administrative Code requires that milk dealers give milk suppliers two weeks notice before changing their source of supply. N.J. Admin. Code, tit. 2, 52-3.1 (1996). This regulation combined with Labatt's control of several local dairies deterred Ideal from taking its business elsewhere, and Ideal's management begrudgingly continued to pay the price increases.

In late 1990, Tuscan began pressuring Ideal to enter a new contract with a five or six year term. Tuscan informed Ideal that, under a new policy implemented at all Labatt-owned dairies, all customers would be required to enter new contracts. Ideal successfully delayed signing a new agreement and secretly began looking for a new supply arrangement.

In May 1992, Ideal began to negotiate with Cumberland Farms dairy ("Cumberland"). Initially, Ideal sought only to acquire a certain size container, which Tuscan had discontinued. Cumberland, however, refused to supply just the one item but offered to supply Ideal with all of its product needs. Once they entered negotiations, Ideal also began building its own depot in Newark, where it could refrigerate products after hauling them from Cumberland's South Jersey premises.

On June 12, 1992, Ideal opened its own depot and began receiving supplies from Cumberland. It abruptly severed its relationship with Tuscan, leaving 15 invoices unpaid. Also in June 1992, Ideal commenced this lawsuit against Labatt, its affiliates, and the Labatt-owned dairies, alleging violations of antitrust, contract, fraud, and tort law. The district court granted the defendants motion for summary judgment and ordered Ideal to pay the unpaid invoices, thereby awarding Tuscan a total of $2,264,333.71. Ideal appeals the district court's summary judgment orders.

## II.

The standard of review applied to the appeal of an order granting summary judgment is firmly established. "An appellate court reviews the district court's grant of summary judgment de novo, applying the same standard as the district court. This requires that [the court] view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995) (citation omitted; emphasis added); see also Helen L. v. DiDario, 46 F.3d 325, 329 (3d Cir.), cert. denied, 116 S.Ct. 64 (1995); Valhal Corp. v. Sullivan Assocs., Inc., 44 F.3d 195, 200 (3d Cir. 1995); Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). Once the movant has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R. Civ. Proc. 56(e)) (emphasis added in Matsushita). The non-movant must present concrete evidence supporting each essential element of its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The question for this court, then, is whether Ideal presented sufficient evidence to create a dispute regarding a genuine issue of material fact, viewing the evidence in the light most favorable to Ideal. Gottshall v. Consolidated Rail Corp., 56 F.3d 530 (3d Cir. 1995); Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1381 (3d Cir. 1991). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted).

The district court had subject matter jurisdiction over the plaintiff's complaint in this case pursuant to 28 U.S.C. 1301, 15 U.S.C. 1 et seq., 28 U.S.C. 1367, and 18 U.S.C. 1965. It had pendent jurisdiction over the plaintiff's state law claims. This court has jurisdiction to review the district court's final order granting summary judgment under 28 U.S.C. 1291.

## III.

The district court properly granted summary judgment dismissing Ideal's fraud and RICO claims, as well as its antitrust claims. There is simply not enough concrete evidence in the record supporting these claims. However, the district court improperly granted summary judgment dismissing Ideal's contract claims because genuine issues of material fact do exist.

A.

In its second amended complaint, Ideal argued that Tuscan breached the 1985 supply contract by increasing prices in a manner not consistent with the pricing formula established by the contract. The district court found that the following facts were undisputed:

> (1) A contract was formed between the parties in 1985, and it contained a price formula; (2) Beginning in 1987, the invoices Tuscan sent to Ideal did not follow the price formula in the contract; (3) Ideal complained about this failure to comply with [the] contract price formula numerous times; (4) Tuscan told Ideal that the invoice prices were the prices it was charging, and that Ideal could take its business elsewhere if it wanted; and (5) Ideal continued to order products from Tuscan at the invoice prices, not contract prices, for a period of five years.

Slip Op. at 19. The court found that there were three possible ways to construe these facts:

> (1) the contract was intact from its formation until June of 1992 and Tuscan continually breached the contract from 1987 on; (2) the contract was intact from its formation until June of 1992, but the price term was modified by the invoices and Ideal's payment on them; or (3) the original signed contract was terminated in 1987, and from the point of termination on the parties formed a new contract each time Ideal ordered goods, Tuscan sent them an invoice, and Ideal made a payment based on that invoice.

Id. at 20.

"Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." Nathanson, 926 F.2d at 1380 (citing Gans v. Mundy, 762 F.2d 338, 340 (3d Cir.), cert. denied, 474 U.S. 1010 (1985)). In addition, "[a]ny 'unexplained gaps' in materials submitted by the moving party . . ., if pertinent to material issues of fact, justify denial of a motion for summary judgment." Ingersoll-Rand Financial Corp. v. Anderson, 921 F.2d 497, 502 (3d Cir. 1990) (quoting O'Donnell v. United States, 891 F.2d 1079, 1082 (3d Cir. 1989)). Finding three possible constructions of the facts suggests that there is a genuine issue of material fact about which a jury could reasonably disagree. The court's finding of factual ambiguity should have ensured that the contract claim proceed to trial.

It is well-established that "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita, 475 U.S. at 587-88 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)). In this case, however, instead of allowing a jury to decide which interpretation of the facts was correct, the district court chose a favored interpretation. Moreover, it chose an interpretation that favors the movant over the non-movant.

The district court immediately rejected the idea that

the 1985 supply contract had been modified by the regular submission and payment of invoices. It based its rejection on a provision of the contract that explicitly prohibits modification by a course of conduct without a signed writing. Joint App. 321–322 (1985 Contract, para. 14). Between the two remaining constructions, the district court held that the third option was "the correct one." Id.

The court held that "as a matter of law, the 1985 Contract was terminated by the departure in 1987 from the pricing terms set forth in that contract." Slip Op. at 23 (emphasis added). In support of its holding, the court pointed out that the agreement was an at-will contract because it provided for no term. The court concluded that, by overcharging, Tuscan "did seemingly indicate [its] termination of the agreement by [its] actions." Id. Thus, the district court held that the at-will contract was terminated in 1987, and from 1987 until 1992, the parties re-contracted each time Tuscan offered a new invoice and Ideal accepted by payment. Id. The court held therefore that, even if Ideal had a claim for breach of contract by termination without reasonable notice, that claim was barred under the four-year statute of limitations for contract claims.

We find that the district court improperly resolved a genuine issue of material fact. The district court's finding that the contract was terminated by implication in 1987 is not the only inference that could reasonably be drawn from the facts. Viewing the facts in a light most favorable to Ideal, Tuscan's management did not indicate that the contract was "meaningless" or "not valid" until late 1990. At that time, Labatt implemented a policy that required Tuscan to enter new supply contracts with all buyers. According to the record, Tuscan began to press Ideal to sign a new agreement in late 1990 or early 1991. See Joint App. 576–88 & 1061.

Until late 1990, Tuscan's management did its best to justify the price increases in a manner that was consistent with the 1985 contract pricing provisions. For instance, at the March 2, 1990, meeting, Mr. Facchina attempted to show on a blackboard that its prices complied with the terms of the 1985 contract. This conduct is not consistent with the district court's finding that the contract was terminated prior to 1990. Rather, by using the 1985 contract as a guide to proper pricing, Tuscan expressed its belief that the contract was operative at the time of the March 2, 1990, meeting.

By 1991, it is logical to conclude that Tuscan had indicated its unilateral termination of the 1985 contract. Ideal filed this suit in June 1992. Ideal may therefore have a valid contract claim that is not time-barred by the statute of limitations applied to contract claims. Because a reasonable jury could find that the termination occurred in 1990 or 1991, rather than in 1987, summary judgment should not have been granted.

In sum, we find that the district court did not view the facts in a light most favorable to Ideal, the non-movant, when it concluded that the contract was unilaterally terminated by conduct in 1987. The court's order granting summary judgment

against Ideal on its breach of contract claim will therefore be reversed and remanded.

### B.

In a single sentence, the district court explained its dismissal of Ideal's claim alleging breach of the contract's implied covenant of good faith. The court said, "It is obvious that defendants cannot have violated good faith by their 'denial of the existence of the Contract,' when the contract was terminated prior to their denial by the change in the prices charged by defendants." Slip Op. at 27–28. The court therefore granted the defendants' motion for summary judgment.

As discussed above, a reasonable jury could find that the supply contract was terminated, not by the prices charged in Tuscan's invoices, but by Tuscan's more explicit repudiation of the contract in late 1990. If the contract was not terminated by its conduct prior to Tuscan's express denial, but rather was terminated by the express denial itself, Ideal may indeed have a claim for breach of the good faith covenant. At any rate, there is a fundamental chronological dispute which presents a genuine issue of material fact relevant to Ideal's claim that Tuscan breached the contract's implied covenant of good faith.

This factual discrepancy was improperly resolved by the district court on summary judgment and should have been preserved for resolution by a jury. Therefore, the court's dismissal of Ideal's claim that Tuscan breached the 1985 contract's covenant of good faith will also be reversed and remanded.

### C.

The same temporal dispute requires reversal of the district court's order granting summary judgment on Ideal's tortious interference with contract claim. The district court held that "[b]ecause Ideal brought its tortious interference with contract claim more than two years after the contract was terminated without reasonable notice," its claim was barred by a two-year statute of limitations. Slip Op. at 31.

The court's conclusion was based on its finding that the contract was terminated in 1987. As we previously concluded, the facts may be reasonably interpreted to support a finding that the contract was not terminated until late 1990 or early 1991. If a jury found that the contract was not terminated until late 1990, the statute of limitations may not bar Ideal's tortious interference claim. Therefore, summary judgment was improperly granted, and the court's order will be reversed and remanded.

### IV.

The district court properly granted summary judgment dismissing the balance of Ideal's claims.

### A.

The district court did not err in dismissing Ideal's claim that Tuscan committed fraud by departing upward from the 1985 contract's pricing scheme. Under New Jersey law, a plaintiff claiming fraud must prove that it detrimentally relied on an intentionally misleading statement made by the defendant. See, e.g., John Hancock Mutual Life Ins. Co. v. Cronin, 51 A.2d 2 (N.J. Err. & App. 1947). Ideal admitted however that, early in its relationship with Tuscan, it became aware that the invoice

prices were higher than the prices envisioned in the contract. Ideal cannot now claim that it detrimentally relied on Tuscan's intentional misrepresentation because Ideal knew it was being overcharged for purchases almost from the start. Therefore, the district court properly found that Ideal had no cause of action in fraud.

B.

For very similar reasons, Ideal cannot make out a claim for violation of the federal RICO statute, 18 U.S.C. 1961 etseq., nor for violation of New Jersey's RICO Act. N.J. Stat. Ann. 2C:41-1 et seq. As the fraudulent predicate acts required by both state and federal RICO statutes, Ideal argued that Tuscan committed mail and wire fraud. However, the district court found that there could be no finding of fraud in light of Ideal's admission that, early in the relationship, it knew that Tuscan was not complying with the contract. Therefore, the district court held that Ideal could "not rely on fraud as a predicate act for purposes of Federal RICO," nor for purposes of New Jersey RICO. Slip Op. at 18-19.

We agree that Ideal cannot make out a claim for mail or wire fraud. Indeed, no fraudulent act occurred in this case. Without a predicate act, Ideal cannot possibly succeed on its federal and state RICO claims. These claims were therefore properly dismissed.

C.

The district court also dismissed Ideal's claim that Tuscan tortiously interfered with its prospective economic advantage. In support of its claim, Ideal alleged that Tuscan undermined its relationships with customers by offering them extremely low prices and that Tuscan told Ideal to stay away from certain new retailers.

The district court found that Ideal failed to present evidence of each essential element of its interference claim. With regard to Ideal's allegation that Tuscan undermined its relationship with a customer, the court found that

> Tuscan entered into an agreement with Ideal to return the customer and to make supplemental payments to Ideal. This in effect eliminated any claim for tortious interference, substituting a contractual obligation.

Joint App. 462 (Dist. Ct. Op. 29). With regard to the allegations that Tuscan employees interfered by warning Ideal to stay away from certain prospective customers, the court found no evidence of injury because "Ideal . . . failed to put forward evidence that it was even interested in any of [those] accounts . . .." Id.

To establish a claim of tortious interference with prospective economic advantage, Ideal must present concrete evidence that Tuscan intentionally and maliciously interfered with a "protectable right," and that Tuscan's interference caused injury. Printing Mart -- Morristown v. Sharp Electronics Corp., 563 A.2d 31, 37 (N.J. 1987). "A complaint must demonstrate that a plaintiff was in 'pursuit' of business." Id. First, Ideal has not shown that it was in serious pursuit of the new accounts

targeted by Tuscan. Second, the allegations made by Ideal fail to reach the necessary level of maliciousness. Id. ("[M]alice is defined to mean that the harm was inflicted intentionally and without justification or excuse."). Tuscan admitted that it was wrong to solicit Ideal's customer and voluntarily gave the account back to Ideal. Third, Ideal has not shown that "'if there had been no interference[,] there was a reasonable probability that [it] would have received the anticipated economic benefits.'" Id. (quoting Leslie Blau Co. v. Alfieri, 384 A.2d 859 (App. Div.), certif. denied, 391 A.2d 523 (1978)).

Thus, we agree with the district court's conclusion that Ideal failed to establish a claim for tortious interference with prospective economic advantage. Summary judgment dismissing this claim was properly granted.

## D.

We also agree with the district court's finding that Ideal failed to present sufficient evidence to support its antitrust claims. At one time, the Supreme Court endorsed a slightly stricter standard of review when a summary judgment order was challenged in an antitrust case. Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473 (1962); Harold Friedman, Inc. v. Kroger Co., 581 F.2d 1068, 1080 (3d Cir. 1978). However, that "special standard" was abandoned in Eastman Kodak Co. v. Image Technical Servs., Inc., 112 S.Ct. 2072, 2083 (1992); see also Town Sound, 959 F.2d at 481 ("It may be that because antitrust cases are so factually intensive that summary judgment occurs proportionately less frequently there than in other types of litigation, but the standard of F.R.C.P. 56 remains the same."). Therefore, the ordinary standard applies. Eastman Kodak, 112 S.Ct. at 2083. In order to survive a summary judgment challenge, a plaintiff must prove that a genuine issue of material fact could be presented at trial, such that a reasonable jury could return a verdict for the plaintiff on that issue.

## 1.

The district court did not err in dismissing Ideal's essential facilities claim. To establish the necessary elements of this claim, Ideal was required to show:

> (1) control of the essential facility by a monopolist;
> (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and
> (4) the feasibility of providing the facility.

Delaware Health Care, Inc. v. MCD Holding Co., 893 F. Supp. 1279 (D.Del. 1995) (citing among others Monarch Entertainment Bureau, Inc. v. New Jersey Highway Auth., 715 F. Supp. 1290, 1300 (D.N.J.) (citations omitted), aff'd 893 F.2d 1331 (3d Cir. 1989)).

The district court properly applied this test and concluded:

> Even if Ideal could demonstrate that defendants monopolized the market, that it was unable to duplicate an essential facility, and that it was feasible for defendants to make the essential facility available to Ideal, Ideal cannot contradict one important fact:

defendants did not deny Ideal use of its facility, the third factor.

Slip Op. at 32.  The district court is correct.  Almost five years after realizing that Tuscan was overcharging it, Ideal's business was still located on the premises of Tuscan Dairy Farms. The facts in the record show that Ideal was not denied use of Tuscan's facilities.

Thus, the district court's ruling in favor of defendants' motion for summary judgment was proper.  Because the New Jersey Antitrust Act provides that it should be construed in a manner consistent with federal antitrust law, Ideal's parallel New Jersey claim was also properly dismissed.  See N.J. Stat. Ann.  56:9-18.

## 2.

Ideal claims that the defendants conspired with Elmhurst Dairy to monopolize milk production in New Jersey, in violation of   1 of the Sherman Act.  15 U.S.C.   1.  The court dismissed this claim, finding that Ideal failed to submit anyevidence supporting its assertion that defendants conspired with Elmhurst.  Slip Op. at 36.  It also found that Ideal failed to present any evidence proving the four essential elements of a   1 claim set forth in J.F. Feeser, Inc. v. Serv-A-Portion Inc., 909 F.2d 1524, 1541 (3d Cir. 1990), cert. denied, 499 U.S. 921 (1991).

A plaintiff alleging a   1 violation has a heavy burden when opposing a summary judgment motion on that claim.  In Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715 (3d Cir. 1991), cert. denied, 505 U.S. 1221 (1992), this court explained: "[W]hen an antitrust defendant's conduct is consistent with both permissible competition and illegal conspiracy, a plaintiff 'must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently' in order to survive a motion for summary judgment."  Id. at 720 (quoting Matsushita, 475 U.S. at 588 (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984))) (emphasis added).

Ideal has not excluded the possibility that the agreement between Elmhurst and Tuscan was completely legal. Although Ideal claimed that the conspiracy was finalized by a written agreement between Tuscan and Elmhurst, no such document was presented to the court.  In fact, the record was so vague that the district court could not determine how the alleged agreement might restrain trade in violation of the Sherman Act. Slip Op. at 36.

The district court was correct to conclude that if the evidentiary record were reduced to admissible evidence, the plaintiff could not carry its burden of proof at trial.  Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (holding that when opposing summary judgment motion, "plaintiff . . . must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law").  Summary judgment was therefore properly granted on Ideal's  1 Sherman Act claim and on its parallel state law claim.

## 3.

To survive a summary judgment motion on its Sherman Act

2 monopolization claim, Ideal had to show that (1) Labatt possessed monopoly power in the relevant market, and that (2) Labatt willfully acquired and maintained monopoly power and did not acquire its monopoly share due to "growth or development as a consequence of a superior product, business acumen, or historical accident." Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 808 (3d Cir. 1984), cert. denied, 477 U.S. 908 (1986).

The district court held that Ideal had not presented sufficient evidence of these essential elements, and it therefore granted the defendants' summary judgment motion. The court gave two reasons in support of its ruling. First, it held that Ideal failed to establish that the relevant geographic market was Northern New Jersey. Slip Op. at 41; see also id. at 46. And second, it concluded that a showing that Labatt held a market share of 47% in New Jersey did not prove the existence of a monopoly in Northern New Jersey. Id. at 42.

Until the late 1980s, milk dealers faced significant regulatory barriers inhibiting free competition between New York City and New Jersey. New York enforced regulations which, for practical purposes, excluded New Jersey dealers from the City. N.Y. Agric. & Mkts. Law 258-c. And New Jersey enforced similar regulations protecting its dealers from New York competitors. N.J. Admin. Code, tit. 2, 52-6.1 & -6.2. By the 1990s, however, both of these regulatory schemes had been challenged in federal courts and repealed. Thus, when Ideal filed its monopolization claim, these barriers no longer limited its potential market to New Jersey.

We agree that Ideal's relevant market and market share calculations are dubious. Ideal bore the burden of establishing the relevant market for purposes of proving its actual monopoly claim. Tunis Bros., 952 F.2d at 726. Ideal argued that the relevant market was Northern New Jersey or, in the alternative, the state of New Jersey. Like the district court, we are not convinced that either is the relevant market for milk. Ideal has failed to clearly establish the relevant product and geographic market necessary to make this claim.

Nor has Ideal persuaded this court that Labatt controls a monopoly share of either proposed relevant market. Ideal estimated that Labatt held 47% of the New Jersey market and then extrapolated from that figure an estimate that Labatt controlled a larger share of the market in Northern New Jersey. It is equally possible that Labatt might hold a smaller share of the market in Northern New Jersey. Ideal offered nothing further to support its speculations. Even if Ideal had shown that Labatt controlled 47% of the New Jersey market, without concrete evidence of anticompetitive behavior, this percentage does not prove Labatt to be a monopolist in New Jersey, nor in Northern New Jersey. Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 201 (3d Cir. 1992), cert. denied, 113 S.Ct. 1285 (1993) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."). We therefore agree with the district court's conclusion that "Ideal fail[ed] to prove that defendants possessed monopoly power in any market." Slip Op. at 42. The district court properly

granted summary judgment.

4.

To prove the essential elements of its attempted monopolization claim, Ideal was required to present concrete evidence that (1) Labatt had engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. See Spectrum Sports, Inc. v. McQuillin, 113 S.Ct. 884, 890-91 (1993). It is clear that, when considering the "dangerous probability" prong of an attempted monopolization claim, a court must "inquir[e] into the relevant product and geographic market and the defendant's economic power in that market." Id. at 892.

Whether a party violates  2 of the Sherman Act by "attempt[ing] to monopolize" is "a question of proximity and degree." Swift and Co. v. United States, 196 U.S. 375, 402 (1905). Further, "the conduct of a single firm, governed by  2, 'is unlawful only when it threatens actual monopolization.'" Spectrum Sports, 506 U.S. at 456 (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)). As the Supreme Court explained:

> The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.

Spectrum Sports, 506 U.S. at 458.

Even assuming that the relevant market was Northern New Jersey, we do not believe that Ideal presented sufficient evidence that Labatt posed a dangerous threat of destroying competition in the milk industry. We conclude that a higher degree and proximity to actual monopolization must be demonstrated before an award of treble damages can be seriously pursued. Without proving a dangerous probability threatening destruction of competition in a clearly defined relevant market, the plaintiff may not proceed beyond summary judgment. Therefore, we find that the district court properly granted summary judgment dismissing Ideal's attempted monopolization claim.

5.

To prove the essential elements of a claim brought under  7 of the Clayton Act, Ideal must prove that it has suffered "injury of the type the antitrust laws were intended to prevent." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). Ideal claims only that competition in the industry has been reduced by Labatt's acquisitions. However, it has not proved that it has been injured by the reduction in competition. Moreover, there is no evidence in the record demonstrating any harm incurred by Ideal. As the district court held, such conclusory assertions alone will not support a Clayton Act claim. The district court properly granted summary judgment on that claim and on Ideal's parallel state law claim.

V.

Finally, Ideal's civil conspiracy claim was also

properly dismissed.  As discussed above, Ideal failed to present sufficient evidence of any conspiracy that allegedly occurred between the Labatt-owned dairies and Elmhurst Dairy.  Ideal additionally claims, however, that the Labatt-owned dairies conspired among themselves to obtain a monopoly in the industry. It is well-established that subsidiaries cannot illegally conspire with a corporate parent under  1 of the Sherman Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777 (1984) (holding that a corporate parent and its wholly owned subsidiary "are incapable of conspiring with each other"). Therefore, the district court properly held that the civil conspiracy claim should also be summarily dismissed.

VI.

We will reverse and remand the district court's order granting summary judgment on the following three claims brought against the defendants by Ideal:  (1) the breach of contract claim; (2) the breach of the contract's covenant of good faith claim; and (3) the tortious interference with contract claim.  We will affirm the district court's order granting summary judgment in favor of defendants on all of the remaining claims.

Ideal Dairy Farms, Inc. v. John Labatt, Ltd., et al., No. 95-5435

SCIRICA, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent from part III of the majority opinion because I believe the district court correctly entered summary judgment on Ideal's contract, implied covenant of good faith, and tortious interference with contract claims.

I.

The Ideal-Tuscan relationship spanned seven years from 1985 to 1992.  Its terms were memorialized in a written contract (the "1985 Contract") that did not specify a term of duration and

did not provide for notice of termination or any other termination procedure. From almost the beginning of the relationship, Tuscan did not comply with the pricing provisions of the 1985 Contract. From 1987 onwards, Ideal repeatedly complained to Tuscan about price increases and asserted that Tuscan's prices were not in accordance with the 1985 Contract. But Tuscan's management consistently refused to adjust invoice prices in response to Ideal's complaints, and Tuscan told Ideal it could take its business elsewhere if it wanted. Nevertheless, Ideal continued to order products from Tuscan at invoice prices for five more years.

On the basis of these undisputed facts, the district court granted summary judgment to the defendants. Opinion, Ideal Dairy Farms, Inc. v. John Labatt Ltd. et al., No. 92-2469 (D. N.J. May 11, 1995). It held that the 1985 Contract was an at-will contract governed by the New Jersey Uniform Commercial Code, and, because the contract was at-will, "[it] was terminated [as a matter of law] by the departure in 1987 from the pricing terms set forth [therein]" Id. at 23. The majority disagrees with the district court's legal analysis. It concludes that factual issues remain as to when Tuscan terminated the 1985 Contract, and believes that Tuscan may have breached the 1985 Contract continuously over a three to five year period.

                                   II.
The 1985 Contract specified no term. Under the New Jersey Uniform Commercial Code, a contract of indefinite duration "is valid for a reasonable time," but "may be terminated at any time by either party." N.J. Stat. Ann.  12A:2-309(2). "Termination of a contract by one party . . . requires that reasonable notification be received by the other party." N.J. Stat. Ann.  12A:2-309(3).

The majority concludes that Tuscan may not have terminated the 1985 Contract until late 1990, when members of Tuscan management informed Ideal that the contract was "meaningless" and "not valid." See Majority Opinion at 14. Under this interpretation, it would appear that an at-will contract cannot be terminated under  12A:2-309(3) unless notification is express. I disagree. A party's conduct may also terminate an at-will contract. See Lumber Enterprises, Inc. v. Hansen, 846 P.2d 1046, 1049-50 (Mont. 1993) ("when [the seller] unilaterally raised its prices, it . . . put an end to the previous contract between the parties"); Michael Halebian N.J., Inc. v. Roppe Rubber Corp., 718 F. Supp. 348, 365 (D.N.J. 1989) (under U.C.C.  2-309, refusal to continue to supply goods in accordance with the terms of an at-will contract terminates the contract, not breaches it). Termination through conduct may not provide the reasonable notice required by  12A:2-309(3), but failure to give reasonable notice does not mean the contract continues ad infinitum. Rather the aggrieved party is entitled to damages arising from the failure to give reasonable notice. See Ronald A. Anderson, Uniform Commercial Code  2-309:27 at 555 (1982) ("When a contract is terminable at any time on notice and it is terminated without notice, the damages which the aggrieved party may recover are limited to those sustained during the

notice period.").

In this case, Tuscan's pricing diverged from the contractual provision in 1987 at the latest. Ideal knew it was being charged a greater amount than that called for by the contract and repeatedly complained. In response, Tuscan clearly demonstrated--both by refusing to change its pricing and through specific statements--that it would not comply with the 1985 Contract. Therefore the contract was terminated at that time. While Tuscan failed to provide Ideal with reasonable notification of termination, its consistent refusal to abide by the terms of the contract terminated the contract. Cf. Agway v. Ernst, 394 A.2d 774 (Maine 1978) (where buyer was unaware of changes in price made by seller, at-will contract was breached and not terminated). Ideal could have recovered damages for Tuscan's failure to provide reasonable notification, but it filed suit after the statute of limitations had run. I would affirm the district court's entry of summary judgment on Ideal's claim for breach of contract.

III.

Because Ideal's implied covenant of good faith and tortious interference with contract claims derive from its contract claim, I would grant summary judgment on those claims as well.

IV.

For the foregoing reasons, I respectfully dissent.