**James A. OLSON and Anita D. Olson, Plaintiffs,**

v.

**ATLANTIC MORTGAGE & INVESTMENT CORPORATION, a Foreign Corporation, Defendant.**

**No. Civ. 6–96–338(RLE).**

United States District Court, D. Minnesota.

Sept. 14, 1998.

Tamara L. Yon, Crookston, MN, for Plaintiffs.

John T. Kelly, St. Paul, MN, for Defendant.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the consent of the parties, in accordance with the provisions of Title 28 U.S.C. § 636(c), upon the Defendant's Motion for Summary Judgment.

A Hearing on the Motion was conducted on February 12, 1998, at which time the Plaintiffs appeared by Tamara L. Yon, Esq., and the Defendant appeared by John T. Kelly, Esq.

For reasons which follow, the Defendant's Motion for Summary Judgment is granted.

### II. *Factual and Procedural Background*

On November 29, 1993, the Plaintiffs executed and delivered a Note, in the principal amount of $67,104.00, in order to finance their purchase of certain real estate which was located at R.R. 2, Box 92, in Mahnomen, Minnesota. The Note was secured by a Mortgage, which was approved by the Federal Housing Administration ("FHA"), and which granted the lender, Metropolitan Federal Bank, F.S.B. ("Metropolitan"), a security interest in the real estate that the Plaintiffs had purchased. On April 24, 1995, Metropolitan assigned its interest in the Mortgage to the Defendant. Shortly thereafter, in September of 1995, the Plaintiffs defaulted on their Note payments and, consistent with the terms of the Mortgage, the Defendant notified the Plaintiffs, by a writing dated September 20, 1995, that they were in default.

As related by the Plaintiffs, they were unable to meet their repayment obligations because Anita D. Olson ("Ms.Olson") had become disabled, and was unable to work. Ms. Olson has averred that she attempted to renegotiate the terms of the Mortgage with one representative of the Defendant, who was "very difficult to work with" and, having been denied permission to remedy a defaulted payment by doubling future Mortgage payments, the Plaintiffs were informed of alternative means to avoid foreclosure. *Affidavit of Anita D. Olson*, at ¶ 3.

When the Plaintiffs failed to make their Note payment in October of 1995, the Defendant transmitted a letter to them, which was dated October 16, 1995, and which informed them of the Defendant's willingness to work with them in curing their default or, if necessary, in discussing alternatives to a foreclosure on their Mortgage. Thereafter, Martha DuBose ("DuBose"),[1] who was a Risk Analyst/FHA Loss Mitigator for the Defendant, advised the Plaintiffs of a preforeclosure program, which was created by the United States Department of Housing and Urban Development, and which was known as the "Short Sale Program." Under this program, the Plaintiffs would be afforded the opportunity of selling their real estate for an amount which was less than their loan indebtedness to the Defendant, and without incurring a deficiency liability. The Plaintiffs made application to invoke the Short Sale Program.

On December 8, 1995, the Defendant approved the Plaintiffs' participation in the Short Sale Program. Among the conditions which the Plaintiffs were obligated to satisfy in order to sell their property pursuant to "the Short Sale Program, were (1) procuring a signed contract of sale with a qualified buyer on or before March 8, 1996; (2) agreeing that the "net" sales proceeds resulting from any such sale would be at least 87% of the Property's appraised value of $72,000.00, or $62,640.00; and (3) completing the sale of the Property within 90 days from the date of [the Defendant's] approval of the [Plaintiffs] participation in the Short Sale Program, in other words, on or before March 7, 1996." *Affidavit of Martha DuBose*, at ¶ 7.

The Plaintiffs first attempted to sell their property, pursuant to the Short Sale Pro-

---

1. At the pertinent times, DuBose was using the surname of "Margean," which was subsequently changed to "DuBose" as a result of a change in her marital status. In the interests of consisten-cy throughout this Order we employ the surname of "DuBose," although the documents to which we refer contain the appellation "Margean," or its misspelling as "Marjean."

gram, to Tammy and Del–Allen Bellanger, but the Defendant rejected the Bellanger's application to assume the Plaintiffs' loan obligations. Thereafter, on January 22, 1996, the Plaintiffs entered an agreement to sell their real estate to Bob and Ann Gordon, for the sum of $67,000.00, with a closing date of March 7, 1996. Prior to the closing date, however, Ms. Olson contacted the Defendant and requested that the closing date be extended to March 18, 1996, in order to allow the Plaintiffs additional time to repair certain damage to the property. Although not required to do so, DuBose consented to the extension, and the closing occurred on March 18, 1996, with the Plaintiffs selling the property to the Gordons for $68,979.02. On March 21, 1996, the closing agent delivered a check to the Plaintiff in the amount of $62,-536.92 and, on the same day, the Defendant executed a Satisfaction of Mortgage, and caused the same to be filed with the Mahnomen County Recorder.

Ms. Olson relates that, prior to the closing on their real estate, the property sustained smoke damage and, consistent with routine adjusting practices, the Plaintiffs' insurer issued the insurance check, for the payment of cleaning and related services, for the joint endorsement of the Plaintiffs and the Defendant. According to Ms. Olson, in April of 1996, she contacted the Defendant in order to secure the release of that check, and was informed that the Defendant was holding the check because the Plaintiffs were in default on their loan obligations. As stated by Ms. Olson, "[a]fter several attempts to try to obtain the check on my own, I eventually had to hire an attorney to obtain the insurance check," which she received in June of 1996. *Affidavit of Anita D. Olson*, at ¶ 6. In contrast, the Defendant argues that, "after endorsing the check and releasing the check to the [Plaintiffs], Ms. DuBose received confirmation on April 18, 1996 that the [Plaintiffs] had endorsed and delivered the same to Jim Hanson of Servicemaster as payment for repairing the fire-damaged property." *Defendant's Reply Memorandum*, at page 4 n. 1.[2]

On June 24, 1996, Ms. Olson met with Jamie Abrahamson ("Abrahamson"), who is a Vice President of the American State Bank of Erskine, Minnesota ("American State Bank"), in order to secure a Minnesota Housing Finance Agency ("MHFA") home improvement loan. On the following day, Ms. Olson provided Abrahamson with a completed MHFA loan application, and copies of the Plaintiffs' W–2 Wage and Tax Statements for 1995. Independently, Abrahamson secured a credit report on the Plaintiffs, from CSC Grand Forks ("CSC"), which was consistent with American State Bank's loan procedures. During a meeting on June 25, Abrahamson asked Ms. Olson for an explanation as to why the CSC credit report contained an entry, under the name of the Plaintiffs, which stated: "Foreclosure Process Started/FHA Mortgage." After responding that the entry was in error, Ms. Olson telephoned DuBose, on June 26, 1996, in order to report the error. Unfortunately, Ms. Olson did not disclose that the error had been observed in the CSC report.

Nonetheless, Ms. Olson's telephone call alerted DuBose to the existence of a coding error as to the Plaintiffs' account with the Defendant. In checking on the matter further, DuBose determined that the Defendant had mistakenly entered a status code designation of "87" to the Plaintiffs' account, which would indicate that a foreclosure was started, rather than a status code of "68," which would reflect that the loan had been paid in full for less than the loan amount. These codes are utilized in the Defendant's

---

2. We are mindful of the notable distinction between an averment, as contained in a sworn Affidavit, and argument as advanced in a legal memorandum. We need not here, however, resolve this factual issue, because it is not material to the issue before us. While, undoubtedly, the Plaintiffs' complaint concerning the insurance check is submitted to demonstrate, inferentially, that there was ill-will between the Plaintiffs and the Defendant, we find no basis to conclude that the Defendant's delayed endorsement of the insurance check reflects upon the Plaintiffs' assertion that the Defendant violated the provisions of the Fair Credit Reporting Act, ("FCRA") *Title 15 U.S.C. § 1681 et seq.* Any expenditure, by the Plaintiffs, to retain an attorney in order to dislodge the insurance check from the Defendant, is not a claim that is recoverable under the FCRA, and the Plaintiffs cite no authority to the contrary. While we have generally considered this incident as reflecting upon the interaction of the parties, its occurrence is tangential, at best, to the issues under deliberation.

computerized credit bureau reporting database. Although CSC is not one of the credit agencies to whom the Defendant regularly discloses its credit bureau reporting data, the Defendant represented that it would send corrective information to the four credit reporting agencies for whom it regularly furnished credit information, on July 22, 1996—which was the next reporting cycle for the furnishing of such information. In addition, DuBose notified Abrahamson, by telefacsimile, of the error in the Defendant's coding of the Plaintiffs' account. Notwithstanding this corrective information, American State Bank rejected the Plaintiffs' loan application, and the parties are in agreement that the rejection was for reasons other than the miscoding that the Defendant had committed. See, *Transcript of Deposition of Anita D. Olson*, at 49–50.

Thereafter, on July 8, 1996, the Plaintiffs applied for a $25,400.00 debt consolidation consumer loan from American Federal Bank of Crookston, Minnesota ("American Federal Bank"). During a meeting with Brenda Crane ("Crane"), who was a representative of American Federal Bank, the Plaintiffs were informed that the bank would be securing a credit report on them. Thereafter, Crane secured a credit report from CSC which contained the same error, as had the earlier report to American State Bank, and she asked the Plaintiffs to explain the entry. The Plaintiffs did not refer Crane to the Defendant, nor did they contact the Defendant to report a corrected entry to Crane. Rather, the Plaintiffs contacted their legal counsel, on that same day, who notified DuBose, by letter dated July 10, 1996, that the Plaintiffs' application for a loan, from the American Federal Bank, had been denied because of erroneous information on the Plaintiffs' credit record. Plaintiffs' counsel directed the Defendant to remove the erroneous information from the Plaintiffs' credit record "immediately," and to send counsel confirmation that the credit record had been corrected. Unfortunately, counsel's letter did not identify the offending credit report as having been generated by CSC.

Upon receiving counsel's letter "on or about July 24, 1996," DuBose contacted LuAnne Becker ("Becker"), who is employed in the Defendant's Loss Mitigation Department, and instructed her to immediately provide notification to the Defendant's four regularly employed credit reporting agencies that the Plaintiffs had not been the subjects of any mortgage foreclosure process initiated by the Defendant. *Affidavit of Martha Du-Bose*, at ¶ 15. On July 24, 1996, Becker notified the four credit reporting agencies, by telefacsimile, that the foreclosure information, as to the Plaintiffs, was in error. Subsequently, on July 25, 1996, Becker sent a telefacsimile to Plaintiff's counsel confirming that the corrected credit information had been transmitted to the Defendant's four credit reporting agencies.

In August of 1996, however, Ms. Olson obtained a copy of the Plaintiffs' credit report from CSC, and determined that the report contained the same erroneous information, concerning an alleged foreclosure proceeding by the Defendant, to which the Plaintiffs had earlier objected. After learning that the error was not corrected in CSC's report, the Plaintiffs' attorney sent another letter to DuBose, which was dated September 3, 1996, requesting that the Defendant correct the records located at CSC. This was the first occasion on which the Plaintiffs identified the offending credit report as having been prepared by CSC.[3] Upon receipt of this letter, DuBose instructed Becker to inform CSC that CSC's credit report was in error, and Becker confirmed to DuBose, on or before September 30, 1996, that the corrective information had been transmitted to CSC.[4]

---

**3.** On this point, there is no dispute. In the words of Ms. Olson:

> Neither I nor my husband ever gave [the Plaintiff] specific information about the CSC Grand Forks credit reporting agency at the time [the Plaintiff] put the false foreclosure information on my credit record. I therefore did not think [the Plaintiff] needed information specific to CSC Grand Forks to *correct* the false foreclosure information.

*Affidavit of Anita D. Olson*, at ¶ 10 [emphasis in original].

**4.** The Plaintiffs also take exception to an "Annual Tax and Interest Statement," which the Defendant transmitted to the Plaintiffs in February of 1997, and which reported that the Plaintiffs had an outstanding loan balance, with the Defendant, in the amount of $65,904.65. The Defendant responds that the referenced statement was to

On this record, the Plaintiffs contend that the Defendant, with malice and with a willful intent to injure the Plaintiffs, failed to correct its error in reporting, as to the Plaintiffs' credit record. In response, the Defendant contends that the record fails to demonstrate any malice, or willful intent on the Defendant's part, and that, therefore, the Defendant is entitled to Judgment as a matter of law.

## III. *Discussion*

A. *Standard of Review.* Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the non-moving party, and we have found no triable issue. *Lower Brule Sioux Tribe v. State of South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Dodd v. Runyon,* 114 F.3d 726, 729 (8th Cir.1997).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." *Rule 56(e), Federal Rules of Civil Procedure;* see also, *Anderson v. Liberty Lobby, Inc.,* supra at 256, 106 S.Ct. 2505; *Ivy v. Kimbrough,* 115 F.3d 550, 551 (8th Cir.1997); *Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997). Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra at 322, 106 S.Ct. 2548; see also, *Greer v. Shoop,* 141 F.3d 824, 826 (8th Cir.1998); *Mayard v. Hopwood,* 105 F.3d 1226, 1228 (8th Cir.1997). No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* supra at 323, 106 S.Ct. 2548; see also, *Bell Lumber and Pole Co. v. United States Fire Ins. Co.,* 60 F.3d 437, 441 (8th Cir.1995); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995); *Settle v. Ross,* 992 F.2d 162, 163 (8th Cir.1993).

B. *Legal Analysis.* In support of its Motion for Summary Judgment, the Defendant argues that it is entitled to qualified immunity, as a result of the provisions of the Fair Credit Reporting Act ("FCRA") Title 15 U.S.C. § 1681 et seq.,[5] and can only be held liable to the Plaintiffs if it reported erroneous credit information, as to them, with malice or with willful intent to injure them. According to the Defendant, the record be-

---

report the Plaintiffs' interest payments for calendar year 1996, and that any assertion that there remained an outstanding loan balance is extraneous to the issues now before the Court. Taking Ms. Olson's averments as true, we agree with the Defendant. The statement at issue is not a credit reporting document, and the Plaintiffs do not suggest, let alone demonstrate, that the statement contained any inaccuracy which caused them any credit or income tax reporting problems. Again, we assume that the statement is referenced as suggesting the presence of malice, or ill will on the Defendant's part, but we are unable to ascribe such an intent on the mere facial

appearance of the Annual Tax and Interest Statement.

**5.** Since the time pertinent to the Plaintiffs' claims, the FCRA was amended in 1996, but the amendments did not take effect until 365 days after September 30, 1996, except as to those entities which opted to comply with the newly adopted provisions. The Defendant did not exercise that option and, therefore, we apply the provisions that were in effect prior to the 1996 amendments. See, *Bakker v. McKinnon,* 152 F.3d 1007, 1011 (8th Cir.1998).

fore the Court would not allow a reasonable Jury to render a finding of malice, or of willful intent, on the part of the Defendant, to injure the Plaintiffs. We agree.

The Plaintiffs' Amended Complaint alleges actions against the Defendant for common law negligence; for malice and/or willful intent to injure the Plaintiffs, in violation of Section 1681h(e),[6] of the FCRA; for willful noncompliance with the FCRA, in violation of Section 1681n of the Act; and for negligent noncompliance with the FCRA, in violation of Section 1681o of the Act. In response, the Defendant asserts that FCRA effectively preempts common law negligence, and that, under Section 1681h(e), the FCRA allows an action for negligence to proceed, only when the Defendant has submitted false information to a consumer reporting agency, with malice or with a willful intent to injure the Plaintiff. The Defendant contends that no such violation occurred here, since the Plaintiff has failed to demonstrate, by competent evidence, the existence of malice, or willful intent, on the Defendant's part. As to Sections 1681n and 1681o, the Defendant notes that these provisions are limited to a "consumer reporting agency or user of information" which, in the Defendant's view, does not include an entity which merely provides information to a consumer reporting agency. We address each of these asserted causes of action in succession.

 While not dispositive of the issue, we suspect that the Plaintiffs' successful effort to amend their Complaint, in April of 1997, in order to allege causes of action other than for common law negligence, is their tacit recognition that such a State law claim is largely foreclosed by the FCRA. We need not engage in surmise, however, nor need we long dwell on this issue, for our Court of Appeals, in *Rhodes v. Ford Motor Credit Company*, 951 F.2d 905 (8th Cir.1991), was faced with the same issue; namely, the plaintiff there

sought to recover on the State law theories of defamation, and negligence, when the defendant incorrectly reported credit information, as to the plaintiff, to credit reporting agencies. With respect to the State law claims, the Court ruled as follows:

> [The plaintiff's] suit is governed by the [FCRA], which establishes a qualified immunity for credit reporters; "no defamation or like actions are allowed under the Act unless malice or willful intent is alleged." Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir.), cert. denied, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); see also 15 U.S.C. § 1681h(e) ("no consumer may bring any action *** in the nature of defamation, invasion of privacy, or negligence *** against any consumer reporting agency *** except as to false information furnished with malice or willful intent to injure such consumer."). Thus, in order to go forward on her state law claims, it was necessary for [the plaintiff] to establish that [the defendant] acted with malice or willful intent to injure her.

Accordingly, whether regarded as being preempted by, or subsumed within, their FCRA claims, it is clear that the Plaintiffs' negligence action, which is not premised upon the Defendant's malice, or willful intent to injure them, is not a viable claim, and we proceed to the Plaintiffs' FCRA causes of action.

The heart of the Plaintiffs' FCRA claim is alleged, in their Amended Complaint, as follows:

> That the Defendant's actions in failing to correct the credit record of the Plaintiffs in a timely manner after repeated requests by the Plaintiffs to make said corrections constitutes malice and/or willful intent to

---

6. Although the Plaintiffs' Amended Complaint refers to "Section 1681(e)," we presume this is mistaken, and that the reference should be to Section 1681h(e), since the Plaintiffs employ that reference in their Memorandum of Law. Denominated as a "limitation of liability" provision, Section 1681h(e) provides as follows:

> Except as provided in section 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation,

invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, except as to false information furnished with malice or willful intent to injure such consumer.

injure the Plaintiffs in violation of the Fair Credit Reporting Act, 15 U.S.C. 1681h(e).

*Amended Complaint,* at ¶ XXI.

Unfortunately, this claim is defeated by the absence of any evidence which would show either malice, or a willful intent, on the Defendant's part, to injure the Plaintiffs. Of course, we understand the Plaintiffs to urge that the Defendant's admitted error, in failing to accurately report the circumstances, by which the satisfaction of the Plaintiff's Mortgage was accomplished, was in addition to other oversights in the Defendant's treatment of the Plaintiffs. Specifically, the Plaintiffs underscore that the Defendant's failure to promptly endorse the insurance reimbursement check, and to provide an Annual Tax and Interest Statement which showed a zero balance on their Mortgage, are reflective of ill will on the Defendant's part.

Even if we were to draw such an inference as to these separate acts, the FCRA is not a broad, general penalty statute, which is intended to punish consumer reporting agencies for any errors in the agency's dealings with a customer. Indeed, the Plaintiffs draw no such authority to the Court's attention. See, e.g., *Hauser v. Equifax, Inc.,* 602 F.2d 811, 815 (8th Cir.1979) ("The Fair Credit Reporting Act does not provide for comprehensive regulation of the consumer reporting industry."). If, for some reason not here evident, the Plaintiffs suffered damage as a result of the Defendant's handling of the insurance check, or of the Annual Tax and Interest Statement, they might have a claim under some other law or regulation, but certainly no compensable loss under the FCRA. As a consequence, our focus turns to the acts of the Defendant in failing to promptly correct the error in credit reporting, which is the crux of the Plaintiffs' claim.

■ Viewed in the Plaintiffs' favor, the evidence of record demonstrates, incontrovertibly, that the Defendant attempted to rectify its credit reporting error when it was called to the Defendant's attention. The Defendant telefaxed a correction of the error to the American State Bank, as soon as the error was brought to its notice and, when the error was reported, on the second occasion—which was within a few days of the first

instance—the Defendant undertook to assure that each of the four crediting agencies, to which it regularly reported credit information, were informed of the error, and provided a corrective entry. CSC was not one of those agencies, and the Defendant was not apprised of CSC's identity, as the offending credit reporting agency, until sometime in September of 1996, at which time the Defendant directly contacted CSC with the corrected Universal Data Form.

We think it noteworthy that the Defendant provided the Plaintiffs' attorney, on July 25, 1996, a copy of the "updating information sheet," which the Defendant had faxed to "all 4 reporting agencies," in order to rectify its prior erroneous report. See, *Affidavit of John T. Kelly, Exhibit J.* The four credit agencies, which were disclosed to the Plaintiffs' attorney, included: "equifax, CCA, TransUnion, and TRW." *Id.,* at 2. CSC was not listed but, then, the Plaintiffs did not inform the Defendant, until some four to five weeks later, that CSC was the offending credit reporter. Once that information was made known to the Defendant, the appropriate correction was effected.

Absent from this Record is the slightest suggestion that the Plaintiffs alerted the Defendant to CSC's false credit report, and that, notwithstanding that notice, the Defendant refused to act on the information. Rather, the contrary is starkly presented. Whenever the false information was brought to the Defendant's attention, the Defendant rectified any false information to the extent that it could. While the Plaintiffs may complain that the Defendant should have interrogated them as to the specific source of the misinformation, we cannot overlook the fact that the Plaintiffs knew that CSC was the source of the false credit report, and yet took no action to disclose that knowledge to the Defendant until September of 1993. Indeed, with respect to the American Federal Bank, the Plaintiffs were sufficiently unconcerned that they did not contact DuBose to communicate the correct information to that lending institution, nor did they request American Federal Bank to contact DuBose, or any other representative of the Defendant.

On this Record, no reasonable Jury could responsibly find that the evidence presented

supports any claim that the Defendant's original false credit report, or its efforts to rectify that falsity, were the products of malice, or of a willful intent to injure the Plaintiffs. Indeed, when confronted, in *Rhodes,* with analogous facts, our Court of Appeals affirmed the District Court's grant of Summary Judgment to the consumer reporting agency. There, the consumer reporting agency promptly corrected the error when the error was brought to its attention. As the Court further explained:

> Evidence in the record indicates that [the defendant] did not furnish the erroneous information after October 1985. [The plaintiff] submitted no evidence to prove otherwise; her claim that [the defendant] subsequently transmitted the false information is merely an inference from the fact that other reporting agencies possessed the information at later dates.

*Rhodes v. Ford Motor Credit Company,* supra at 907.

Likewise, the Plaintiffs offer no evidence that the Defendant furnished the false credit information to any party after the error was first brought to the Defendant's attention, and the fact that "other reporting agencies possessed the information" is not a sufficient showing to the contrary. Indeed, here, when the identity of the offending agency was shared with the Defendant, that agency was promptly informed of the false information. Accordingly, as a matter of law, we find no basis for the Plaintiffs' claim under Section 1681h(e) of the FCRA.

The Plaintiffs have advanced two other claims under the FCRA, but these claims are plainly unavailing. First, the Plaintiffs claim that, by failing to timely correct the false credit information that it had originally generated, the Defendant either engaged in willful noncompliance with the FCRA, in violation of Section 1681(n)[7], or engaged in negligent noncompliance, in violation of Section 1681(o).[8] We find both contentions untenable, as a matter of law, for each of the

Sections cited have sole application to those who are a "consumer reporting agency," or a "user of information." Quite simply, in furnishing information to a consumer reporting agency—that is, to CSC—the Defendant was not functioning as either a "consumer reporting agency," or a "user of information." Notably, the Plaintiffs do not so much as argue that the Defendant was a "consumer reporting agency," since such a claim is foreclosed by the definition of that phrase in Section 1681a(f) of the FCRA, which specifically excludes "any report containing information solely as to transactions or experiences between the consumer and the person making the report." See, *DiGianni v. Stern's,* 26 F.3d 346, 349 (2nd Cir.1994) ("Retailers *** that merely furnish information to consumer reporting agencies based on their experience with consumers are not consumer reporting agencies within the meaning of the FCRA."), cert. denied, 513 U.S. 897, 115 S.Ct. 252, 130 L.Ed.2d 173 (1994); *Smith v. First National Bank of Atlanta,* 837 F.2d 1575, 1579 (11th Cir.1988) (bank that reported information concerning experience with a customer is not a "consumer reporting agency"), cert. denied, 488 U.S. 821, 109 S.Ct. 64, 102 L.Ed.2d 41 (1988); *Rush v. Macy's New York, Inc.,* 775 F.2d 1554, 1557 (11th Cir.1985) (holding that one who "did not more than furnish information to a credit reporting agency" is not a "consumer reporting agency"); *Nuttleman v. Vossberg,* 585 F.Supp. 133, 136 (D.Neb.1984) ("[W]here a business is furnishing information based solely on its experience with a consumer, the information is not a consumer report and, in that situation, the business is not a consumer reporting agency.").

While the Plaintiffs contend that the Defendant is a "user of information," they provide no authoritative support for that claim, but predicate its propriety on their surmise that the Defendant relied upon consumer reports in rejecting the application of the Bellingers to assume their loan. They offer no evidence to that effect, however. While not cited by either party, we recognize that

---

7. As here pertinent, Section 1681n(a) provides as follows:

> Any consumer reporting agency or user of information which willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer ***.

8. Section 1681o(a) provides in pertinent part:

> Any consumer reporting agency or user of information which is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer ***.

the Court's decision, in *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 49 (2nd Cir. 1997), can be construed as endorsing such a presumption, insofar as the Court reasoned, in part, as follows:

> [W]e find it unnecessary to offer a categorical definition of "users of information" in order to decide this appeal because we are persuaded that [the defendant] clearly qualifies as a "user of information" and that [the Plaintiff] should be given an opportunity to prove that the individual defendants also qualify. [The defendant]—an automobile dealership—is clearly a party that in the ordinary course of business would have occasion to request and receive credit. reports from consumer reporting agencies for the permissible purposes described in § 1681b. It is therefore precisely the sort of party that would be expected to "use" credit reports under the Act. Presumably, it was by virtue of [the defendant's] being in this position that the individual defendants were able to obtain plaintiff's credit report from a consumer reporting agency. Whatever other types of parties Congress had in mind when it included the term "users of information" in § 1681n, we are convinced that [the defendant]—a prototypical "user" of credit reports—qualifies.

Obviously, if any person, who can be presumed to employ credit reports in the ordinary course of its business, is a "user of information," then, in all probability, the Defendant here would so qualify.

We respectfully decline, however, to adopt such an all-encompassing definition for the term "user of information." In *Northrop,* the formulation of that definition was clearly *dicta,* for the defendant there had inquired, and had received, the plaintiff's consumer credit report, even though the defendant had been conducting no business with the plaintiff "of any kind." *Id.* at 44. Surely, a person who requests, and who receives a credit report, which specifically pertains to the complaining party, is a "user" within any rational definition of that statutory term. Perhaps the Court, in *Northrop,* felt duty bound to presume that the defendant had employed the report, for some business purpose relating to the plaintiff, because the defendant refused to respond to the plaintiff's request for an explanation as to why the report had been requested, and as to how the report had been employed, and the defendant claimed that all of its computerized records had been destroyed. Most notably, however, *Northrop* did not present the circumstances that we here face—namely, the absence of *any* showing that the Defendant had secured a copy of the Plaintiff's credit report.

■ All that is alleged against this Defendant is that it reported false information to a credit reporting agency. As we have noted, if such a report were maliciously false, or if it was issued with a willful intent to injure the Plaintiff, then there would be liability under the FCRA, but we find no basis to presume that either Section 1681n or 1681o should be so broadly construed as to encompass every person who could be presumed to have employed, in the ordinary course of business, a credit report concerning some person other than the complaining party. The Plaintiff offers no such authority, and our independent review has disclosed none. Rather, the cases are to the contrary.

In *Rivera–Lebron v. Cellular One,* 13 F.Supp.2d 235 (D.P.R. 1998), the defendant reported the plaintiffs to a credit reporting agency for failing to pay for telephone services. The plaintiffs contended that the defendant's report was false and that, because of that report, the plaintiffs were denied a loan because of their "bad credit." *Id.* at 237. The District Court dismissed the plaintiffs' claim, under the FCRA, and held as follows:

> We thus hold that [the defendant] is not a "consumer reporting agency" as defined by section [1681a(f) ] nor is [the defendant] a user of information gathered by consumer reporting agencies, as it is defined in the statute. Viewed in the light most favorable to plaintiffs' claim, [the defendant] is a party who furnishes information to a credit reporting agency, and as indicated by Alvarez Melendez [v. Citibank], [705 F.Supp. 67 (D.P.R.1988) ], that alone is insufficient to invoke federal question jurisdiction.

*Id.* at 239.

As noted, the same result was reached in *Alvarez Melendez v. Citibank,* 705 F.Supp. 67, 69–70 (D.P.R.1988), and, in *Lema v. Citibank (South Dakota) N.A.,* 935 F.Supp. 695,

698 (D.Md.1996), the Court concluded that similarly situated defendants were "apparently not users of information for purposes of the FCRA" but, even if they were, the "FCRA requires consumer reporting agencies, not those who merely report information to them, to report accurate information." In *DiGianni v. Stern's*, supra at 348, the plaintiff suggested on appeal, that the defendants, who were retail merchants who had provided allegedly false information to a credit reporting agency concerning the plaintiff, were liable under the FCRA as "users," but the plaintiff had not alleged "that either of them denied credit or increased the charge for credit to her on the basis of information supplied by reporting agencies" and, accordingly, the defendants were not found liable to the plaintiff on that ground.[9]

■ We conclude that the result reached in *Rivera–Lebron, Alvarez Melendez, DiGianni*, and *Lema*, is the correct one, not because we have found no contrary authority, but because any other result would be wholly anomalous. As we have noted, in defining a "consumer report," Congress took pains to exclude from that definition the precise information that the Defendant here generated, and that the Plaintiff cites as the singular basis for the Defendant's liability—namely, "a report containing information solely as to transactions or experiences between the consumer and the person making the report." When Congress elected to impose liability on persons who generated such a report, it made that intent clear by extending the coverage of the FCRA beyond a "consumer reporting agency," and a "user of information," so as to include "any person who furnishes information to a consumer reporting agency." See, *Title 15 U.S.C. § 1681h(e)*. If Congress had intended to subject "any person who furnishes information to a consumer reporting agency," to the same liability that

extends to a "consumer reporting agency," or a "user of information," then we are confident that Congress would have included such persons in Sections 1681n and 1681o, as it had in Section 1681h(e). "Where Congress has not seen fit" to extend liability to persons who non-maliciously furnish false information to a consumer reporting agency, "the courts may not legislate to the contrary." *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 840, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990).

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendant's Motion for Summary Judgment [Docket No. 16] is GRANTED.

2. That Judgment is entered in favor of the Defendant.

---

**9.** We are mindful that the Court, in *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46–47 (2nd Cir.1997), distinguished its prior holding, in *DiGianni*, on this precise ground. Of course, in *Northrop*, the Court was considering whether the defendant had violated the FCRA by obtaining credit information about the plaintiff under false pretenses. As the Court stated the issue in *Hoffman*:

If in fact the "requirements" of the FCRA, the willful violation of which supports civil liability

under § 1681n, include the requirement under § 1681q not to obtain credit information using false pretenses, then willful violation of this requirement also provides a basis for liability against "users of information."

Here, the Plaintiff does not allege that the Defendant violated Section 1681(q), and the Court, in *Northrop*, did not so much as suggest that it had reached an incorrect result in *DiGianni*, on the precise issue which is now before this Court.