2002 ME 118

**Daniel B. MYSHRALL Jr.**

v.

**KEY BANK NATIONAL ASSOCI-
ATION, f/k/a KEY BANK OF
MAINE**

Supreme Judicial Court of Maine.

Submitted on briefs:  Oct. 15, 2001.

Decided:  July 30, 2002.

Sumner H. Lipman, Walter F. McKee, Lipman & Katz, Augusta, for the plaintiff.

James M. Bowie, Thompson & Bowie, Portland, for the defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

Daniel Myshrall appeals from a summary judgment entered in the Superior Court (Kennebec County, *Atwood, J.*) in favor of Key Bank National Association on all remaining counts in Myshrall's complaint.[1] Myshrall brought a series of common law causes of action against Key Bank based on his allegation that Key Bank falsely reported information about him to a credit reporting agency. He also asserts a claim under the Federal Fair Credit Reporting Act, 15 U.S.C. § 1681 (Federal Act) for improperly obtaining his credit report during the course of this litigation. We affirm the judgment.

In 1989, Myshrall purchased a motorcycle and financed the purchase with a loan of approximately $7000 from Key Bank.[2] Myshrall also purchased disability insurance that provided for the payments due on the loan in the event of his death or disability. Although the insurance was provided by a third party, it was sold to Myshrall when he took out the loan and

---

1. An additional count alleging Key Bank's refusal to obtain insurance payments on Myshrall's loan after Myshrall's injury has subsequently been dismissed.

2. The note was assigned to Key Bank by the seller.

Myshrall never had any direct interactions with the insurance company.

Myshrall was injured and asked Key Bank about the disability insurance. He dealt with Susan Spaulding, who worked in Key Bank's credit collection department. Myshrall told Spaulding that he believed he was covered by disability insurance, but Spaulding told him that he did not qualify. Myshrall testified that he argued with Spaulding, who eventually told him that she was "tired of dealing with f—ing deadbeats" like him. Myshrall then asked to speak with Spaulding's supervisor but, according to Myshrall, the supervisor was also unhelpful. Ultimately, Myshrall and Key Bank negotiated a voluntary repossession of the motorcycle and Myshrall surrendered the motorcycle to Key Bank.

Several years later Myshrall applied for a loan from the Gardiner Federal Credit Union. Myshrall was denied the loan, in large part because TRW,[3] a credit reporting agency, was reporting that Myshrall was in default on three separate loans with Key Bank. The report showed not only that Myshrall had defaulted on the motorcycle loan, but that Myshrall had defaulted on two additional loans with Key Bank, loans that he had never taken. The amounts of these two additional loans were approximately $7000 and $25,000, respectively, and all three loans had the same account number. Those additional loans were not being reported by other credit reporting agencies.

The statements of material fact submitted by the parties and relied on by the court, make substantial reference to the depositions taken by the parties. Those statements of material fact assert the following: Daniel Plourd, who testified on behalf of Key Bank, initially stated that the extra accounts might have been creat-ed by a computer glitch that occurred when Key Bank changed over its computer system not long after Myshrall's loan originated. This could provide an explanation as to why Myshrall's loan would have been listed three times (with the same account number) on the Key Bank system, but Plourd admitted that it does not satisfactorily explain why one of the loan amounts was shown to be for $25,000. Plourd acknowledged that human intervention had to occur at some point for a loan to be reported in that amount, and that it would have been possible for Spaulding to send a memo to the clerical department instructing it to change the information being reported to credit reporting agencies. Any information that a Key Bank employee directed the clerical department to report to credit reporting agencies, however, would almost certainly be reported to all three major national agencies. An employee outside the credit department could not have caused derogatory information to be reported to only one credit reporting agency.

Key Bank's statement of material facts explained the process by which Key Bank communicated information to the credit reporting agencies. Every month Key Bank would send a magnetic tape to the credit reporting agencies that contained any information about its customers that it wanted reported on its customers' respective credit reports. Most of the information, such as information about a customer's payment history, was placed on this tape automatically. Other information, such as corrections of information previously entered, had to be inputted manually by the clerical personnel. The way for a person to change information on a credit report was to send what was referred to internally as a "remove derogatory" form to the clerical department, which would in turn

---

3. TRW is now known as Experian.

send the information to the credit reporting agency on the next tape to go out.

Myshrall contacted Key Bank about the inaccurate information, and he received a letter in response from Plourd, dated February 3, 1992. The letter acknowledged that Key Bank had mistakenly listed the delinquent account three times. Myshrall inferred from the admission that Key Bank would correct the inaccurate information.

After Plourd investigated Myshrall's complaint, he sent a letter to the clerical department asking them to correct the information. The information was not corrected, however, and it is not clear why.

The statements of material facts reveal that neither Plourd nor Myshrall attempted to verify that the information in the credit report had been corrected. Myshrall learned that the problem had not been resolved in 1993, when he was denied another loan. Rather than contact Key Bank personally, Myshrall referred the matter to his then-attorney. His attorney sent Plourd a letter dated September 7, 1993, demanding that Key Bank immediately correct the information.

On receiving the letter, Plourd called Myshrall's attorney to figure out what the problem was, but the attorney did not return his call. Plourd attempted to call the attorney again about three weeks later, and again did not receive a call back. Plourd never checked whether the information on Myshrall's credit report had been corrected after receiving the attorney's letter.

Myshrall filed a complaint against Key Bank in which he sought damages to compensate him for financial harm to his business caused by the inaccurate credit reports based on theories of negligence, slander, breach of fiduciary duty, and breach of contract. Myshrall also requested punitive damages.

The complaint alleges that Key Bank was continuing to misreport the credit information at the time of the initiation of this suit. To verify whether misinformation was continuing to be reported as alleged in the complaint, Key Bank requested Myshrall's credit report from TRW on December 18, 1997. After learning that Key Bank had made such a request, Myshrall amended his complaint to include a new count seeking recovery pursuant to section 1681b(3)(F) of the Federal Act for attempting to obtain credit information about him under false pretenses and without a legitimate business reason.

### I.

■ Except for the Federal Act claim asserted in the later added count, Myshrall's claims are all common law causes of action. We must first determine whether, as Key Bank contends, Maine's Fair Credit Reporting Act (Maine Act), 10 M.R.S.A. §§ 1311–1329 (1997 & Supp.2001), as it existed during the events that gave rise to this suit, preempted common law causes of action by a consumer against a supplier of credit information for misreporting information about the consumer.[4]

■ When the Legislature acts in an area previously governed by the common law, we presume that it did not intend to disrupt the common law any more than the statute necessarily requires. *Emery Waterhouse Co. v. Lea*, 467 A.2d 986, 996

---

4. At the time of the events in this case, the Maine Act provided a cause of action only against credit reporting agencies and users of credit information. The Legislature added section 1328–A to the Maine Act in 1997. 10 M.R.S.A. § 1328–A (Supp.2001). This section regulated the conduct of *furnishers* of credit information, which Key Bank is for purposes of this case. *See id.* Myshrall concedes that section 1328–A does not apply retroactively.

(Me.1983). We will not interpret a statute to limit or alter the common law absent clear and explicit statutory language to that effect. *Caron v. School Admin. Dist. No. 27*, 594 A.2d 560, 563 (Me.1991). The mere fact that the Legislature creates a cause of action in an area where a common law cause of action already exists does not mean that the Legislature intends to make the statutory cause of action the exclusive remedy for an aggrieved party. *Klingerman v. SOL Corp. of Maine*, 505 A.2d 474, 476 (Me.1986). Absent clear language indicating that the Legislature intended the statute to be the exclusive source of a remedy, the statutory cause of action will supplement, not supplant, the common law cause of action. *Id.*

The Maine Act has three enforcement provisions. Section 1322 provides a civil remedy for willful noncompliance with the Act's requirements:

> Any consumer reporting agency or user of information which willfully and knowingly fails to comply with any requirement imposed under this chapter with respect to any consumer is liable to that consumer in an amount equal to the sum of:
>
> **1. Actual damages.** Any actual damages sustained by the consumer as a result of the failure;
>
> **2. Treble damages.** In addition to actual damages, there shall be assessed against the willful violator a sum of 3 times such actual damages.
>
> **3. Costs of attorney's fees.** In the case of any successful action to enforce any liability under this section, the costs of the action together with reasonabl[e] attorney's fees as determined by the court.

10 M.R.S.A. § 1322 (1997).

Section 1323 allows a consumer to recover for negligent noncompliance with the Maine Act. It is substantially similar to section 1322, except that subsection (2) provides:

> Such amount of additional damages as the court may allow, but not less than $100 for each violation of this chapter involving negligence, and for each consumer report containing any item of information that was inaccurate and that contributed in whole or in part to the decision to take adverse action against the consumer.

*Id.* § 1323(2).

Sections 1325 and 1326 provide criminal penalties for persons who knowingly and intentionally obtain or provide credit information in an unlawful manner. *Id.* §§ 1325–26.

We do not discern clear and explicit language in these provisions of the Maine Act that would suggest a Legislative intent to eliminate the availability of common law causes of action for false reporting of credit information. Accordingly, the Maine Act does not displace or modify the common law causes of action asserted by Myshrall.

## II.

Title 15 U.S.C. § 1681h(e), which is part of the Federal Act, provides:

> Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action,

based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e).

██ Although it does not completely preempt state law causes of action for the mishandling of consumer credit information,[5] section 1681h(e) gives furnishers of credit information qualified immunity from state law causes of action "in the nature of defamation, invasion of privacy, or negligence." [6] *See Rhodes v. Ford Motor Credit Company,* 951 F.2d 905, 906 (8th Cir. 1991). This qualified immunity, however, is not available to a defendant who acts with malice or a willful intent to injure the plaintiff. *Id.* If the plaintiff is able to prove that the defendant acted with malice or a willful intent to injure him, then section 1681h(e) will not bar recovery under state common law. *Id.* Summary judgment for the defendant is appropriate when the plaintiff does not have sufficient evidence to support a finding of malice or willful intent. *See id.; Olson v. Atlantic Mortg. & Inv. Corp.,* 24 F.Supp.2d 976, 981 (D.Minn.1998); *Wiggins v. Equifax Services, Inc.,* 848 F.Supp. 213, 223 (D.D.C. 1993).

█ Myshrall contends that the evidence that Spaulding became irritated with Myshrall and referred to him as a "f——ing deadbeat[ ]," supports a finding that an employee of Key Bank caused the incorrect information to be reported to TRW with malice or a willful intent to injure him. Myshrall contends that, because Key Bank does not offer a sufficient credible explanation for the incorrect reports, this evidence is sufficient to establish that Spaulding maliciously set into motion a course of events whereby Key Bank began reporting false information about Myshrall's credit history in retaliation for Myshrall's complaining to her supervisor.

Even though the cause of Key Bank's error remains unexplained, Myshrall's theory is, at best, speculation. Moreover, the undisputed evidence submitted by Key Bank about its operating procedures establish that Myshrall's theory is highly improbable. Only one credit reporting agency, TRW, was reporting the erroneous loan information. Because the clerical department reported the same information to all the major credit reporting agencies, such information would have been reported to all three agencies if Spaulding had instructed the clerical department to report the false information.[7] Since the incorrect information only appeared on the TRW report, the errors on the TRW report may not have been generated by Key Bank, and it is most unlikely that they originated with Spaulding. The Superior Court properly concluded that Myshrall

**5.** In 1997, Congress adopted 15 U.S.C. § 1681t(b)(1)(F), which contains more extensive preemption provisions relating to state law causes of action. It does not apply to this case, however, because the events that gave rise to Myshrall's action occurred before 1997 and section 1681t(b)(1)(F) does not clearly indicate that it is to apply retroactively. *See Martin v. Hadix,* 527 U.S. 343, 352, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999) (in order for statute to apply to conduct that occurred before its enactment, Congress must have clearly indicated that it intended the statute to apply retroactively).

**6.** Myshrall does not contest that his actions are "in the nature of defamation, invasion of privacy, or negligence" within the meaning of section 1681h(e).

**7.** It may have been *possible* for someone in the clerical department to arrange for derogatory information to be sent to only one agency, but this would have been highly irregular, and Spaulding did not have the authority to instruct the clerical department to do so. There is no evidence that any employee of the clerical department had any animus toward Myshrall.

failed to present evidence from which a reasonable fact finder could find that any agent of Key Bank acted with malice or a willful intent to injure him, and correctly entered a summary judgment in favor of Key Bank.[8]

### III.

Title 15 U.S.C. § 1681n imposes civil liability on any person who willfully fails to comply with any requirement of several enumerated provisions, including section 1681b(f). Section 1681b(f) prohibits any person from obtaining a consumer report for a reason other than a reason authorized by the statute. Section 1681b(a)(3) in turn authorizes a person to obtain a report from a consumer reporting agency when the person obtaining the report

> (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or
>
> . . . .
>
> (F) otherwise has a legitimate business need for the information—
>
> (i) in connection with a business transaction that is initiated by the consumer; or
>
> (ii) to review an account to determine whether the consumer continues to meet the terms of the account.

15 U.S.C. § 1681b(a)(3).

■ Myshrall contends that Key Bank violated section 1681b(f) of the Federal Act when it obtained Myshrall's credit report after this litigation had begun because, he contends, preparing for litigation is not a purpose authorized by section 1681(a)(3) or any other provision. Although Key Bank acknowledges that it obtained the report specifically to prepare for this litigation, and not to monitor the account in the routine course of its business operations, its purpose for obtaining the report falls within the broad language of section 1681b(a)(3).[9] *Cf. Spence v. TRW, Inc.,* 92 F.3d 380, 383 (6th Cir.1996) (defendant being sued by consumer for reporting false credit information generally has a "legitimate business need" to obtain the report to prepare its defense).

The entry is:

Judgment affirmed.

---

**8.** Because we affirm the summary judgment on the grounds, we need not address Key Bank's contention and the Superior Court's conclusion that Myshrall's complaint is barred by the statute of limitations.

**9.** Myshrall argues that *Bakker v. McKinnon,* 152 F.3d 1007, 1009 (8th Cir.1998), supports his position that Key Bank violated 15 U.S.C. § 1681, when it obtained the credit report.

*Bakker* does not support Myshrall's position because the inquiring party in that case had never been involved in a business relationship with the consumer and was engaged in an attempt to "dig up dirt" on the consumer that was unrelated to the subject matter of the litigation in order to coerce a settlement. *Id.* at 1011.